# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **Alexander E. Jones** | § | **Bankruptcy Case No. 25-33553** |
| **Debtor** | § | |
| | § | |
| | § | |
| **ALEXANDER E. JONES AND** | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | |
| *Appellants,* | § | |
| | § | **Civil Action No. 4:25-cv-05553** |

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas, Houston Division
Cause No. 25-05553

## APPELLANTS' MOTION FOR EXPEDITED EMERGENCY INJUNCTIVE RELIEF

Shelby A. Jordan
Antonio Ortiz
**Jordan & Ortiz, P.C.**
State Bar No. 11016700
Federal Bar No. 2195
500 N. Shoreline, Suite 804
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Fax: (361) 888-5555
Email: sjordan@jhwclaw.com
        aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

Ben C Broocks
St. Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
**Broocks Law Firm, PLLC**
248 Addie Roy Road, Suite B301v
Austin, Texas 78746
Telephone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
        wbroocks@broockslawfirm.com

**ATTORNEYS FOR APPELLANTS**

# **TABLE OF CONTENTS**

Page No

I       EMERGENCY INJUNCTIVE RELIEF SOUGHT                          1

II      THE LAW ON EMERGENCY RELIEF                                 2

III     THERE WILL BE IRREPARABLE HARM TO APPELLANTS IF             3
        EMERGENCY INJUNCTIVE RELIEF IS NOT GRANTED; APPELLEES
        WILL EXPERIENCE NO HARM

IV      APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON      4
        THE MERITS

V       PUBLIC INTEREST IS SERVED BY GRANTING THIS RELIEF           7

VI      THE ISSUES HAVE BEEN FULLY BRIEFED; APPELLEES WILL NOT BE   9
        PREJUDICED BY EMERGENCY CONSIDERATION

VII     AGGREGATED PLAINTIFFS AND THEIR DIRTY HANDS                 13

        CONCLUSION AND PRAYER FOR RELIEF                            19

i

## INDEX OF AUTHORITIES

| | |
|---|---|
| *Anderson v. Archer,*<br>        2019 Tex.App. LEXIS 10061 (Tex.App. Austin -- 2019) | 7 |
| *Arnold v. Garlock,*<br>        278 F.3d 426 (5th Cir. 2001) | 2 |
| *Brown v. Chesnut (In re Chesnut),*<br>        422 F.3d 298 (5th Cir. 2005) | 1 |
| *Chisholm v. Chisholm,*<br>        2007 Tex. App. LEXIS 3936  (Tex. App.—San Antonio, 2007) | 8 |
| *Coyle v. Walker,*<br>        2025 Tex.App. LEXIS 317, *12 (Tex.App.--Austin, 2025, pet. denied) | 7 |
| *Delta Air Lines v. Pan Am Corp. (In re Pan Am Corp.),*<br>        162 B.R. 667 (S.D.N.Y 1993) | 7 |
| *Griggs v. Provident Consumer Disc. Co.,*<br>        459 U.S. 56 (1982) | 5 |
| *Harte-Hanks Commc'ns v. Connaughton,*<br>        491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) | 13 |
| *In re Transtexas Gas Corp. v. TransTexas Gas*,<br>        303 F.3d 571 (5th Cir. 2002) | 5 |
| *Kane v. Nat'l Union Fire Ins. Co.,*<br>        535 F.3d 380 (5th Cir. 2008) | 6 |
| *Lafferty v. Jones,*<br>        229 Conn. App. 487, 510 n.26 (2024) | 14 |
| *Minor Child. v. Roman Cath. Church of the Archdiocese  (In re Roman Cath. Church of the Archdiocese),*<br>        2024 U.S. App. LEXIS 17574 (5th Cir. 2024) | 1, 5 |
| *Ogden v. Dickinson State Bank,*<br>        662 S.W.2d 330 (Tex 1983) | 7 |
| *Reliant Energy Servs., Inc. v. Enron Canada Corp.,*<br>        349 F.3d 816 (5th Cir. 2003) | 1 |

| | |
|---|---|
| *SRE Restructuring, Inc. v. Wooley (In re SI Restructuring, Inc.),*<br>    542 F.3d 131 (5th Cir. 2008) | 6 |
| *State Office of Risk Mgmt. v. Lawton,*<br>    295 S.W.3d 646, 650 (Tex. 2009) | 7 |
| *Viegelahn v. Lopez (In re Lopez),*<br>    897 F.3d 663 (5th Cir. 2018) | 6 |
| *Wright v. May 27, 2011 Order (In re May 2011 Order),*<br>    2021 U.S. App. LEXIS 35716 (6th Cir. 2021) | 6 |
| *York v. State*,<br>    373 S.W.3d 32 (Tex. 2012) | 8 |

**APPENDIX**

| Appendix No.[1] | Description |
|---|---|
| Appendix A | 6/21/24 Order Dismissing Case (ROA.000156) |
| Appendix B | 9/25/24 Order Supplementing Order Dismissing Case (ROA.000285) |
| Appendix C | 2/5/25 Hearing Transcript (ROA.003316-3335) |
| Appendix D | 6/5/25 Hearing Transcript (ROA.003436-3506) |
| Appendix E | 10/1/25 Order Confirming that FSS Assets Are Not Subject to the Automatic Stay (ROA.006748-6749) |
| Appendix F | Receiver's Notice of Hearing and Motion |
| Appendix G | Onion Articles Announcing Intentions |
| Appendix H | Higher Bids |
| Appendix I | Transcript of the September 2024 hearing that resulted in the Supplemental Vesting Order |
| Appendix J | Connecticut Plaintiffs and the Texas A Plaintiffs request for an advisory opinion in the bankruptcy court asking for its declaration that at the February 2025 Hearing the bankruptcy court had declared the Supplemental Vesting Order "null and void" |

---

[1] Appendix A-E are attached to Appellants Opening Brief and incorporated herein by reference.

iii

| | |
|---|---|
| Appendix K | October 2025 Bankruptcy Hearing Transcript Resulting in October 2025 Order |
| Appendix L | Texas A Plaintiffs Statement of Issues On Appeal Re Supplemental Vesting Order |
| Appendix M | Appellants' Request For Reconsideration of October Order |
| Appendix N | Austin Court of Appeals Stay Order |
| Appendix O | Connecticut Plaintiffs Intervention in Texas Plaintiffs Appeal |

## I.    EMERGENCY INJUNCTIVE RELIEF SOUGHT

This Emergency Motion is filed by Alex Jones ("Jones") and his wholly owned company, Free Speech Systems, LLC ("FSS").  Jones's broadcast/media activities are conducted primarily via the vehicle known to the public as "InfoWars."  His "InfoWars" platform was as asset of FSS. The assets of FSS, including InfoWars, are now assets of Jones's Bankruptcy Estate, having been duly conveyed to the bankruptcy estate by orders of the bankruptcy court entered on June 21, 2024 (the "June Vesting Order") [**Appendix A**] which was reaffirmed in another order dated September 25, 2024 (the "Supplemental Vesting Order") [**Appendix B**].

These assets are protected by the automatic stay provisions of 28 U.S.C. §362 the scope of which is a question of law reviewed de novo.   "Because the scope of an automatic stay is a legal question, this Court reviews that issue de novo."   *Minor Child. v. Roman Cath. Church of the Archdiocese (In re Roman Cath. Church of the Archdiocese),* 2024 U.S. App. LEXIS 17574, *4 (5th Cir. 2024) (J. Jones) ci*ting Reliant Energy Servs., Inc. v. Enron Canada Corp.,* 349 F.3d 816, 825 (5th Cir. 2003).  Furthermore, the stay is in effect even if assets are merely "arguably" in the Estate. *Brown v. Chesnut (In re Chesnut),* 422 F.3d 298, 303 (5th Cir. 2005).

Nevertheless, on Thursday April 30, 2026 at 2:00PM a Texas state court will entertain a motion from an illegally appointed receiver to sell assets of the Bankruptcy Estate of Jones, which the state court receiver has no authority to sell, and he will do so in violation of the automatic stay of §362.  He is doing this in part because of an order entered by the bankruptcy court, the validity of which is currently on appeal to this Court (hereafter identified as the "October Order" or the "Nonvesting Order").

1

Appellees' goals are first to remove Jones from the airwaves, as has been repeatedly stated by them, particularly by the lawyers for the Plaintiffs [2] throughout the trials referenced hereafter, as well as in their public statements after the trials, including attempting to purchase at a contrived auction the InfoWars assets so the brand could be destroyed, and Jones would be put off the air. But the goals are actually deeper. As reflected in Art. III, their self-announced other goals are to confuse and scatter millions of listeners who listen to and/or watch InfoWars using an impersonator/comedian whose voice sounds like Alex Jones in attempt to confuse InfoWars listeners. **Appendix G**. As will be demonstrated hereafter, this planned deception of millions of citizens warrants this Court's full and immediate attention.

Appellants request that this Court temporarily restrain the April 30, 2026 state court hearing and any such sale, until this Court has had an opportunity to review these matters in a full temporary injunction proceeding. Without this injunctive relief, once that sale occurs, serious questions will arise about the potential mootness of the appeal currently pending before this Court those actions may have. The underlying matters are too complex and susceptible of misstatement to be handled without such a hearing, as the Plaintiffs have proven themselves capable of dramatic overstatement and in many instances, misstatements. To allow them to proceed in a hurried manner where Appellants' due process rights are trampled is unconscionable yet easily avoided by granting the relief herein requested.

## II.    THE LAW ON EMERGENCY RELIEF

In the Fifth Circuit, courts employ a four-part test to determine whether a stay pending the determination of an appeal is merited. *See Arnold v. Garlock*, 278 F.3d 426, 438 (5th Cir. 2001). In summary,  a movant must show (1) a likelihood of success on the merits of the appeal; (2)

---

[2] The term "Plaintiffs" refers to the group hereafter identified as the fifteen Connecticut Plaintiffs, the two Texas A Plaintiffs, and the three Texas B Plaintiffs, identified and discussed in Art. VII hereof.

irreparable harm to the movant if the stay is not granted; (3) lack of substantial harm to the non-moving parties if the stay is granted; and (4) benefit to the public interest if the stay is granted. These grounds are easily satisfied here but will be addressed somewhat out of order.

### III.    THERE WILL BE IRREPARABLE HARM TO APPELLANTS IF EMERGENCY INJUNCTIVE RELIEF IS NOT GRANTED; APPELLEES WILL EXPERIENCE NO HARM

This emergency motion seeks immediate injunctive relief in order to preserve this Court's appellate jurisdiction and to prevent a gross miscarriage of justice.  Immediate injunctive relief is required for this Court to carefully review the state court proceedings in light of binding bankruptcy orders that have been grossly distorted.   No one will be harmed if the state court matters are temporarily enjoined, to allow this Court an opportunity for a full review of these matters.  Otherwise, if allowed to proceed, those state court proceedings could prove fatal to this appeal and cause irreparable damage to Appellants.

Alex Jones is a media defendant whose world-wide broadcast/media programming is viewed or heard by approximately 30,000,000 viewers/listeners daily and during special occasions, by as many as 100,000,000 viewers/listeners. Jones's broadcast/media activities are conducted primarily via the vehicle known to the public as "InfoWars."  His "InfoWars" platform was as asset of FSS, his wholly owned limited liability company.

The state court Receiver's Notice of Hearing and Motion are attached hereto as **Appendix F**.  In them, the Receiver has announced his intention on Thursday April 30, to ask for and receive permission from a state court to (1) license/lease away all of FSS's trademark and domain rights including the InfoWars domain for a month-to-month minimal fee, and (2) grant that license/lease to a satirical publication called "The Onion" who has announced its intention to use people with voices similar to Jones to deceive the listening audience of InfoWars into thinking Jones is speaking.  **Appendix G.**   Furthermore, the Receiver intends to ignore higher bids submitted by

3

third parties. **Appendix H**.  Presumably, the Plaintiffs hope that if this succeeds, then the appeal pending before this Court will somehow be mooted which in and of itself is a valid ground for harm.  But if that sale occurs, the value of the InfoWars asset will be severely damaged, perhaps irreparably and the harm to a confused public will be devastating.

Of course, FSS will have no voice in this hearing—even to suggest counterproposals that would fetch significantly more for these assets—as the state trial court judge treats these matters as *ex parte*, and in a manner extremely hostile to FSS.  Thus, Jones and FSS must turn to this Court for emergency temporary relief to preserve the basis for the appeal of this matter.

## IV. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Jones and FSS have a substantial likelihood of success on the merits of the issues in the underlying appeal before this Court.  In summary, the following facts are undisputed and they are outcome determinative demonstrating Appellants are almost certainly likely to prevail in this appeal:

1.  FSS's assets, including InfoWars, were judicially conveyed to the bankruptcy estate of Jones (the "Estate") pursuant to 11 U.S.C. §349(b) by two orders entered by the bankruptcy court, the first being entered on June 21, 2024 ("June Vesting Order") [3] [**Appendix A**]  and the second order being entered on September 25, 2024 ("Supplemental Vesting Order") [**Appendix B**]. [4]  The June Vesting Order and the Supplemental Vesting Order are sometimes referred to as the "Prior Vesting Orders."

2.  As a result of these orders those assets are in the hands of the Jones bankruptcy trustee, Chris Murray (herein called the "BK Trustee" to distinguish him from the US Trustee) who is not a party to this case.

3.  Both orders confirm such conveyance.  The transcript of the September 2024 hearing that resulted in the Supplemental Vesting Order, prompted by the US Attorney, removes any doubt that a conveyance of FSS assets was intended and occurred. **Appendix I.**

---

[3] Appellees refer to this as the "Dismissal Order."

[4] Appellees refer to this as the "Supplemental Dismissal Order."

4.  Upon transfer pursuant to §349(b), FSS assets, including InfoWars, became §541 property of the Estate, immediately subject to the automatic stay of §362(a). As noted the scope of the automatic stay is a question of law for this Court. *Minor Child. v. Roman Cath. Church of the Archdiocese (In re Roman Cath. Church of the Archdiocese),* 2024 U.S. App. LEXIS 17574, *4 (5th Cir. 2024).

5.  The group identified hereafter as the Texas A Plaintiffs (more particularly identified in Article VII) appealed the Supplemental Vesting Order to the United States District Court on October 11, 2024, virtually immediately upon its entry (the "Texas Plaintiffs' Appeal") [**Appendix L**], which appeal remained until voluntarily dropped by the Texas A Plaintiffs on May 6, 2025. During the pendency of that appeal, the bankruptcy court was without jurisdiction to issue any orders affecting the Prior Vesting Orders, particularly the Supplemental Vesting Order. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).

6.  Upon dismissal of the Texas Plaintiffs' Appeal, the Supplemental Vesting Order became fully final, not subject to direct or collateral attack, and not subject to alteration by even the bankruptcy court.

7.  At a hearing that occurred on February 5, 2025 (the "February 2025 Hearing"), [Transcript **Appendix C**] the bankruptcy court made certain comments about the further use of the Supplemental Vesting Order in light of the court's concerns about the continued collusion of the Bankruptcy Trustee with the Connecticut Parties, the Texas A Plaintiffs and the Texas B Plaintiffs (which collusion is discussed in Article VII hereof) but did so while the Texas Plaintiffs' Appeal was pending. Notably, the very collusion the enraged bankruptcy court rejected, has now come to full fruition in state court.

8.  At another hearing on June 5, 2025 (the "June 2025 Hearing"), [Transcript **Appendix D**] the bankruptcy court acknowledged on the record, that given the pendency of the Texas Plaintiffs' Appeal, the bankruptcy court lost any jurisdictional capacity to say or do anything in the February 2025 Hearing, that would have an effect on the Supplemental Vesting Order. [5] *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). *See also In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571 (5th Cir. 2002).

9.  On September 26, 2025, the Connecticut Plaintiffs and the Texas A Plaintiffs filed a request for an advisory opinion in the bankruptcy court asking for its declaration that at the February 2025 Hearing the bankruptcy court had declared the Supplemental Vesting Order "null and void," and as a result FSS's assets, including InfoWars, were not property of the Jones Bankruptcy Estate and thus not subject to the automatic stay. **Appendix J.** In that motion, those Plaintiffs implicitly conceded that FSS's assets had previously been part of the Jones Bankruptcy Estate and subject to the stay, but urged that the February 2025 Transcript Hearing declared the Supplemental Vesting Order

---

[5] Excerpts of the bankruptcy court's comments are found in Appellants' Opening Brief, at p. 14.

null and void, which in some unarticulated way effected a reconveyance of the FSS assets and thus the stay was no longer applicable.

10. A hearing on Plaintiffs' motion that occurred on October 1, 2025 [transcript **Appendix K**] resulted in an order of October 1, 2025 (the "Nonvesting Order" or sometimes, the "October 1 Order") [**Appendix E**], stating that even though the words of the Supplemental Vesting Order expressly stated  FSS Assets "shall be deemed to have vested in [the Jones Bankruptcy Estate]," the bankruptcy court stated that (a) there was a difference between conveying assets and "deeming" them conveyed; and (b) the bankruptcy court had only "deemed" them conveyed and thus FSS assets were never part of the Estate under §541 as they had never been conveyed to the Estate.  Ignoring the Fifth Circuit's explicit instruction in *Viegelahn v. Lopez (In re Lopez)*, 897 F.3d 663, 669 (5th Cir. 2018) holding that the term "vest" means to confer ownership of property, the October Order concluded that FSS assets were never part of the Jones Bankruptcy Estate and thus not protected by the automatic stay. [6]

11. As assets of the Jones Bankruptcy, the Bankruptcy Trustee has only two options: either sell the assets or abandon them.  *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008).  A sale in bankruptcy court will certainly bring more than what the state court receiver is asking to do on April 30, 2026.

Moreover, as a result of these undisputed facts, FSS's assets were judicially conveyed to the Jones Bankruptcy Estate and have never been unconveyed.  Furthermore no statute, rule or case allows a §349 conveyance once made, to be later judicially re-conveyed or re-vested back to FSS.

The October Order or Nonvesting Order" is void as Plaintiffs' belated request to the bankruptcy court was actually for an advisory opinion about the final Prior Vesting Orders.  It is clear that "federal courts do not issue advisory opinions.  By asking a federal court to void a 'correctly adjudicated' order, an advisory opinion is all that Wright is asking for." *Wright v. May 27, 2011 Order (In re May 2011 Order)*, 2021 U.S. App. LEXIS 35716, *3 (6th Cir. 2021).

It is also void as it is an impermissible collateral attack on the Prior Vesting Orders over

---

[6] Appellants requested that the bankruptcy court reconsider its October Order (or Nonvesting Order) which the bankruptcy court declined to do.  [**Appendix M**] In light of (a) the comments made by the bankruptcy court at the October Hearing, (b) its denial of the motion to reconsider, and (c) urgency of the timing, Appellants were not required to first ask the bankruptcy court for the relief herein sought.  S*RE Restructuring, Inc. v. Wooley (In re SI Restructuring, Inc.)*, 542 F.3d 131, 135 (5th Cir. 2008).

which no court has subject matter jurisdiction, not even the bankruptcy court itself. *Coyle v. Walker*, 2025 Tex.App. LEXIS 317, *12 (Tex.App.--Austin, 2025, pet. denied).    Indeed, the Supplemental Vesting Order is a final, non-appealable order that not even the judge himself has authority to alter, outside the strict parameters of FRCP 60.   *Delta Air Lines v. Pan Am Corp. (In re Pan Am Corp.),* 162 B.R. 667, 672 (S.D.N.Y 1993).

Even if Judge Lopez was permitted to "interpret" his Prior Vesting Orders in October 2025, he could not do so if his interpretation is clearly erroneous--a judgment this Court must make. c.*f. State Office of Risk Mgmt. v. Lawton*, 295 S.W.3d 646, 650 (Tex. 2009).  And in neither state nor federal court can the bankruptcy court revise its Prior Vesting Orders under the guise of interpretation. *Anderson v. Archer,* 2019 Tex.App. LEXIS 10061, *7 (Tex.App. Austin -- 2019).

And even if this Court is permitted to review the October Order to "interpret" it, applying the rules of contract/order construction requires this Court to do so interpreting all relevant writings together including the Prior Vesting Orders and the hearing transcripts which gave them birth. When done, it is clear its comments in the October Order and related transcript are in irreconcilable conflict with the unconditional words of the Prior Vesting Orders themselves as well as the dialog that resulted in the Supplemental Vesting Order.  And under the rules of construction, if a provision is in irreconcilable conflict with other provisions, it must be disregarded. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex 1983). Without question, FSS assets were unconditional transferred to the Estate and thus protected at all times by the automatic stay.

### V.    PUBLIC INTEREST IS SERVED BY GRANTING THIS RELIEF

As referenced, Alex Jones is a media defendant whose world-wide broadcast/media programming is viewed or heard by between 30,000,000 and 100,000,000 viewers/listeners.  This is a massive cross section of the public who will deceived by the intended actions of the Appellees if Appellees are allowed to proceed without this Court's confirmation of their right to do so, which

is presently pending before this Court in the underlying appeal.

Beyond the irreparable harm that will result to the public if this Court does not enjoin the state court receiver from proceeding on Thursday April 30, 2026, the public will also be served including specifically the Austin Court of Appeals where issues are presently pending that this appeal can and should resolve.

Specifically, in August 2025, the Connecticut Plaintiffs and the Texas A Plaintiffs jointly asked the state district court for a turnover order and appointment of a receiver. Before that hearing, Appellants posted a bond as to the Texas A Plaintiffs' judgment, at which point the Connecticut Plaintiffs proceeded in their request for appointment of a receiver on their judgment, which the trial court granted. Making virtually the same arguments made here, Appellants promptly asked the Austin Court of Appeals to stay the effectiveness of the Connecticut Plaintiffs turnover/receiver order which stay the Austin Court granted. [**Appendix N**]. In essence, Appellants have argued that the foregoing facts demonstrate that FSS assets are in the hands of the Jones Bankruptcy Trustee and are thus subject to the automatic stay provisions of §362. As under Texas law, actions taken in violation of the automatic stay are void, not voidable, the determination of the applicability of the stay is crucial. [7] *York v. State*, 373 S.W.3d 32, 39-40 (Tex. 2012). Under Texas law, even the filing of motions asking for relief is void. *Chisholm v. Chisholm*, 2007 Tex. App. LEXIS 3936, *2 (Tex. App.—San Antonio, 2007).

The Texas A Plaintiffs then proceeded with their own request for turnover/receiver which the trial court granted. The state court receiver took no action on his appointment for the Texas A Plaintiffs' judgment, as it is believed the receiver thought, as do most observers, that the judgment

---

[7] Relatedly, the actual ownership of FSS assets is important to a determination of FSS's net worth for bonding purposes, as the trial court has judicially declared FSS assets are now held by FSS, having bought Appellees' argument that the at the February 2025 Hearing the bankruptcy court declared the Supplemental Conveyance Order "null and void" thus somehow effecting a re-conveyance of those assets.

in favor of the Texas A Plaintiffs will be reversed on appeal. However, the receiver recently abruptly changed his position and to the surprise of the Appellants, filed his motion which is attached as **Appendix F**. Appellants have since also asked the Austin Court of Appeals to stay that as well on most of the same points, and that court has yet to rule.

On a determination by this Court that the October Order, or the Nonvesting Order, is invalid, all parties and the Austin Court of Appeals will be informed so that judicial resources are conserved and mistakes averted, some of which will be potentially catastrophic.

## VI.    THE ISSUES HAVE BEEN FULLY BRIEFED; APPELLEES WILL NOT BE PREJUDICED BY EMERENCY CONSIDERATION

Appellants filed their Opening Brief on March 3, 2026. Appellees, who now appear to include not only the Connecticut Plaintiffs and the Texas A Plaintiffs, but also the Texas B Plaintiffs, filed their Response Brief on Monday, April 27, 2026. Hence their positions are fully briefed developed. [8]

As to Appellees' Response Brief ("Response"), Appellants respectfully submit that the most charitable thing that can be said is that it is badly misleading. For example, the Response does not even mention the June 2025 hearing where the bankruptcy court itself stated on the record that it had lost any authority to affect the Supplemental Vesting Order by virtue of the Texas Plaintiffs' Appeal. They mention in a footnote only the fact that they appealed the Supplemental Vesting Order [Response, p. 7, note 9] but do not even acknowledge the overwhelming authority stating that their own appeal rendered the bankruptcy court's comments at the February 2025 hearing -- the lynchpin of their positions -- void.

Neither do they mention that in that appeal, the Texas A Plaintiffs identified in their statement of appellate issues that the effect of the Supplemental Vesting Order was to vest all FSS

---

[8] Although Appellants' Reply brief is not yet due.

property in the Jones Bankruptcy Estate:

> **STATEMENT OF ISSUES**
>
> 1.    Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

[**Appendix L**].

Equally missing is any reference to the facts that the Connecticut Plaintiffs intervened in that appeal and judicially admitted that the original June Order (which they refer to as the "Dismissal Order") vested FSS assets in the Estate and the Supplemental Vesting Order merely clarified that vesting, the Plaintiffs writing:

> 14.    On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket. (Bankr. Dkt. 1021). This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee. *Id.*

[**Appendix O**]. Obviously, if the Supplemental Vesting Order "clarified that as of the entry of the original Dismissal Order" FES assets had been conveyed, no one has suggested the June Vesting Order that Plaintiffs call the "Dismissal Order" has been affected.

And neither do they mention the September 2024 Hearing [**Appendix I**] that gave birth to the Supplemental Vesting Order, material portions of which are excerpted in Appellants' Opening Brief.    While the entirety of the short September 2024 Transcript should be perused (and is examined in more detail in the Opening Brief), some excerpts are as follows that clearly

demonstrate Judge Lopez intended the June Vesting Order to vest all FSS assets in the Estate and

that everyone--including Plaintiffs--knew this  and the Supplemental Vesting Order was intended

to confirm what the court had already done (the following quotes from that transcript come from

**Appendix I,** only page numbers noted; emphasis added):

THE COURT: It is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS. 541, **all legal or equitable interests. All. And all has got to mean all**....[p.16]

*****

THE COURT: No, no, it's not my interpretation.  It's Congress. Congress used the word all. **All legal and equitable interests of the debtor become property of the estate. All means all. And we can't shortchange what all means**. And -- and upon conversion unless otherwise ordered [*referring to §349*].... **And all has got to mean all. And we don't get to kind of pick and choose what all means**. .... [p.16-17].

*****

THE COURT: .... **But what I'm saying is it's already there. What you're asking for is belt and suspenders. Let's not act like it's not already there.....But what you're asking me for really is belt and suspenders.** [p.17-18].

*****

THE COURT: **That was always the intent. Right?** ... **But I'm just saying that was always the intent. Everybody knew. ..I'm more than happy to clarify in my order that all the assets -- if it didn't include it in the assets, that's why he has the cash, right**? ... He's got everything. **That was always the intent as to what was going on**...**I just think we're getting in the technicalities here. But that certainly was what I ordered at the time**. [p.24]

******

11

**THE COURT**: <u>Unless otherwise ordered by the Court</u> [*referring to §349(b)*]. We don't have to get into what's unusual or not. Everything is case specific. ...I think that's why Congress gave everyone flexibility.... [p.25]:

***** 

**THE COURT**: Mr. Wolfshohl [*BK Trustee counsel*], what about that?... <u>**I'm going to give you** [*i.e., the BK Trustee*] **all the assets of FSS. I'm going to clarify that that's what you** [*i.e. the BK Trustee*] **always had, the assets of FSS. And I just want to make sure that other people look at it so that no one then -- I sign something and then somebody comes in and asks me to reamend the order**</u>... [p.26–27]

In his concluding remarks, Mr. Nguyen, counsel for the US Trustee summarized the need for an order making it completely clear that title to FSS assets had been vested in the Estate as §541 property under §349 by virtue of the June Vesting Order, stating [p.26]:

> MR. NGUYEN: Your Honor, if you clarify the order to include all of FSS hard assets as property of the estate, the U.S. Trustee won't have any objection. I think you are able -- you have discretion under 349 to order otherwise. As long as that order is clear, we're fine with that.

The resulting Supplemental Vesting Order confirmed that in the June Vesting Order, the court had exercised its discretion to vest all FSS property §541 property of the Estate pursuant to §349(b), stating

12

> 1. Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

Hence, the Supplemental Vesting Order was to meet the objection of the US Trustee and "clarify" what the court always intended by the June Vesting Order.  With respect, the bankruptcy court must have forgotten its comments.  But as they were made on the record, they clearly reveal the bankruptcy court's error in issuing the October Order (or Nonvesting Order).  Still, there is no excuse for the Appellees/Plaintiffs to not have addressed these points.

### VII.    AGGREGATED PLAINTIFFS AND THEIR DIRTY HANDS

The "Appellees" here consist of three groups:

1. **Connecticut Plaintiffs** -- consist of fifteen Connecticut Plaintiffs, who are mothers, fathers, spouses, and siblings of six of the twenty six victims at Sandy Hook, along with one unrelated FBI agent.  These plaintiffs procured a liability-decreeing default judgment against Jones and FSS [9] as a result of which a Connecticut trial court adopted their unilateral *allegations*, would not allow them to be challenged and presented those allegations to a damages-only jury as conclusively proven. This resulted in a judgment of $1,000,000,000 (i.e. one billion dollars) in compensatory damages for an average award of $66,000,000 per Connecticut Plaintiff, who were also awarded approximately $500,000,000 in additional punitive damage, for an average punitive damages award of $33,333,000 per Connecticut Plaintiff, totaling almost $100,000,000 awarded to each Connecticut Plaintiff. [10] The Connecticut Court of Appeals threw out the CUTPA claims and

---

[9] The trial court entered "Death Penalty Sanctions" for three trivial reasons.  Two of the three specified reasons were tied to alleged discovery deficiencies regarding claims the Connecticut Plaintiffs asserted under the Connecticut Unfair Trade Practices Act ("CUTPA"), that Jones profited from publications about the Sandy Hook murders when the U.S. Supreme Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues.  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) The third reason was Jones's lawyers asked the trial court for a commission to take an out of state deposition of Hillary Clinton.

[10] Jones has filed a counterclaim under 42 U.S.C.S. §1983 alleging that as a media defendant, commenting on matters of public concern regarding public figures, the United States Supreme Court in repeated cases has declared that such

damages but affirmed the rest. [11] The Connecticut Supreme Court and US Supreme Court both denied review.

2. **Texas A Plaintiffs** -- consist of Neil Helsin and his former spouse, Scarlett Lewis who sued Jones and FSS in Texas state court.   As with the Connecticut Plaintiffs, Heslin and Lewis also received a liability-decreeing default judgment against Jones and FSS [12] as a result of which the same Texas trial court overseeing the Receiver, adopted their unilateral allegations, would not allow them to be challenged and presented those allegations to a damages-only jury as conclusively proven.  Heslin was awarded $110,000 for defamation and $2,000,000 for intentional infliction of emotional distress (IIED).   Ms. Lewis, who only sued for IIED, was awarded $2,000,000.   While the statutory cap on punitive damages set forth in Tex. Civ. Prac. & Rem. Code Ann § 41.008(b) was $750,000 for each, the trial court disregarded these and Heslin was awarded $24,700,000 in punitive damages and Lewis was awarded $20,500,000 in punitive damages, for a total award of $50,043,923.80.   Oral arguments on these judgments occurred in May 2025, and the parties are awaiting the opinion of the Austin Court of Appeals.

3. **The Texas B Plaintiffs** -- consist of three plaintiffs who filed suit in Texas but have yet to try their cases, meaning no judgments have been rendered for them.  One of the Texas B Plaintiffs' claims has nothing to do with Sandy Hook.

The Texas A Plaintiffs and Texas B Plaintiffs are herein sometimes collectively referred to as the Texas Plaintiffs.

The Response the Plaintiffs just filed in this appeal repeatedly claims that Judge Lopez's statements at the February 2025 Transcript hearing about the Supplemental Vesting Order were tied to the auction which the court disapproved on 12/11/24.  But the reality is that the auction failed due the chicanery of the BK Trustee, the Connecticut Plaintiffs, and the Texas Plaintiffs.

---

cases trigger heightened, non-waivable constitutional safeguards and a State may not delegate to private litigants the power to determine the truth or falsity of protected speech, the existence of malice, or the constitutional limits on punishment involving a press/media defendant speaking on matters of public concern in a suit brought by public figures.  The liability decreeing default judgment ignored all of these, and the State of Connecticut therefore ceased to perform its adjudicatory role and instead conferred that role on private litigants.

[11] Jones and FSS were the victims of serious attorney error, the Court of Appeals noting that Jones's lawyers did not even raise any issues on the US Constitution, which were thus deemed waived.  *Lafferty v. Jones*, 229 Conn. App. 487, 510 n.26 (2024) ("The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned.")

[12] The grounds for the default judgment entered in Texas were even more spurious than the grounds in Connecticut, being tied to alleged discovery deficiencies in TCPA discovery served on Jones and the fact that the Connecticut trial court had granted a default.

14

Moreover, if it is true as the Plaintiffs allege, that the failed auction of December 2024, was truly the catalyst for the bankruptcy court to declare the Supplemental Vesting Order "null and void," then logically when the auction failed, so too did the transfer of FSS assets to the Estate.  Yet after the failed December auction, the bankruptcy court then ordered the BK Trustee again to sell FSS again, this time for cash.  This raises the obvious point that it would not have taken the bankruptcy court until February 2025 to so announce that a failed December auction was the catalyst for declaring the Supplemental Vesting Order "null and void" were that the case, which demonstrates Plaintiffs arguments are simply false.

The truth is that the catalyst for the bankruptcy court's comments in February 2025 was not a failed December auction, but a failed conspiracy precipitated by a failed settlement attempted by the BK Trustee, the Connecticut Plaintiffs and the Texas Plaintiffs.  Again, after rejection of their failed auction in December 2024, the judge ordered the BK Trustee to sell FSS assets and do so for cash as the court itself reiterated in the February 2025 Transcript, [**Appendix C**] the court stating.

> So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

[Appendix C, p. 9:1-6].

But that did not happen.  As noted by the bankruptcy court itself,  instead, the BK Trustee and Plaintiffs engaged in more notorious conduct, the court noting their nefarious actions taken

15

after the failed auction:  (i) they did not even attempt a sale; (ii) the Texas Plaintiffs who had originally *opposed* the Supplemental Vesting Order and even appealed it, inexplicably now embraced it;  (iii) they proposed a "settlement"; and (iv) an instrumental part of that settlement was the BK Trustee's agreement to  allow a claim against FSS for $430,000,000 to the three Texas B Plaintiffs who had yet to try a case and all when FSS had been dismissed months ago.  In short, the normally very even keeled Judge Lopez was furious:

> So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.
>
> The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.
>
> So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

[**Appendix C;** p.12:1-15].  Curtailing debate, he then said any further use, or more precisely misuse, of the Supplemental Vesting Order was null and void, not the order itself:

16

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

[**Appendix C**; p.14:12-17]. By not trusting "the process" the court clearly meant the BK Trustee who in conspiracy with the Plaintiffs had misused the process.  It was in this context that Judge Lopez made his comments at that February 2025 Transcript hearing.

And what had actually happened behind closed doors in reaching that settlement was that the Texas A Plaintiffs with a total of $50 million in judgments along with the Texas B Plaintiff who held no judgments, we're facing the Connecticut plaintiffs with $1.5 billion in judgments, thereby positioning themselves to claim over 97% of the Jones assets.  The Texas Plaintiffs believed, and made statements to this effect, that when the underlying Sandy Hook events were the same for both groups and liability decreeing default judgments had occurred in both cases, the appropriate thing to do was to simply "count heads," meaning with 15 Connecticut plaintiffs and five Texas plaintiffs, the sharing ratio should be 75/25.   But it didn't stop there.  The Texas Plaintiffs threatened the Connecticut Plaintiffs with exposing the extraordinary absurdity of $1.5 billion in judgments the Connecticut Plaintiffs had received unless the Connecticut Plaintiffs gave enough of that judgment to equalize the percentages.  The first attempt at this was the failed settlement agreement with the BK trustee where to achieve that 75/25 split they all agreed the three Texas B Plaintiffs who had yet to try their cases were to be allowed claims in excess of $450 million, which coincidentally, coupled with Texas A plaintiff $50 million resulted in a 1.5/.5 ratio,

17

or 75/25.  When Judge Lopez in anger properly rejected that chicanery, the Plaintiffs then resorted to state court where they have worked out an undisclosed settlement agreement among themselves to achieve that 75/25 split. But their agreement has been at the expense of the integrity of the bankruptcy process as well as the judicial processes in the state of Texas and Connecticut.  That arrangement underlies the matter currently pending before the state court judge. Appellants fervently hope that discovery will be allowed into that nefarious arrangement to expose precisely what is happening and why.  At a minimum, this gives these Plaintiffs, dirty hands.

And as to "lifting the stay" at the February 2025 hearing, no one had asked that the stay be lifted and in fact the BK Trustee and Plaintiffs had requested the hearing in reliance on the Supplemental Vesting Order, not to amend or modify it.

The Response claims that Judge Lopez's out-of-context declaration in the February 2025 Transcript hearing that any further use was null, somehow meant FSS assets re-reverted back to FSS.

First Judge Lopez never even suggested a re-transfer of assets. Second, no law exists that would permit this to occur. Third, the then-pending Texas Plaintiffs' Appeal had divested all jurisdiction in the bankruptcy court to accomplish that, even if the fantasy was indulged that that is what he intended.

Furthermore, even pretending the Texas Plaintiffs Appeal did not restrict him, there was just no way Judge Lopez could lift any stay as to FSS assets, as FSS's bankruptcy had been dismissed in June 2024.  One cannot lift the stay on an entity whose bankruptcy was dismissed months ago.

Even more significantly the Response omits any discussion of Judge Lopez's statements in the June 2025 Transcript including Judge Lopez asking: "The question is do we do another sale? That's the real question."   [**Appendix D**] Instead of acknowledging the obvious point that even

18

considering another sale meant the Prior Vesting Orders were still in force and the FSS assets still with the BK Trustee, the Plaintiffs ignore that inconvenient fact hoping this Court will as well. Even if a mechanism existed by which a §349 vesting could be unwound, it is inconceivable to suggest that months after such an unwinding of FSS assets, they could be regathered by the Estate. This beyond a frivolous argument -- yet they presented it to state court judge who accepted it, appointed a receiver, and considered ordering sanctions for Appellants even bringing it up.

To state the obvious, Judge Lopez was considering whether to order yet another sale because he knew the BK Trustee/Estate still held FSS assets.

## CONCLUSION AND PRAYER

In conclusion, (1) the Supplemental Vesting Order is undisturbed; (2) FSS assets are still held by the Estate and thus not even eligible for a turnover proceeding and certainly not for sale; (3) the automatic stay is intact and has never been lifted. This Court is therefore requested to

    a. restrain the April 30, 2026 attempt for the state court receiver to sell or transfer rights to the FSS assets;

    b. grant Appellants discovery into the backroom arrangements the Plaintiffs have reached and other relevant matters;

    c. set this matter for an evidentiary preliminary injunction hearing; and

    d. grant Appellants such other rights to which they shall show themselves justly entitled, both at law and in equity.

19

Dated:  April 29, 2026

Respectfully submitted,

/s/ Ben C. Broocks

Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com

/s/ Shelby A. Jordan

Shelby A. Jordan
Texas Bar No. 11016700
Antonio Ortiz
Texas Bar No. 24074839
**JORDAN & ORTIZ, PC.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas, 78401
Phone: (361) 884-5678
Fax:     (361) 888-5555
Email:  sjordan@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR APPELLANTS**

20

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2026, a true and correct copy of the foregoing document was sent via electronic mail to all counsel and parties listed on the Court's ECF filing system.

*/s/ Ben Broocks*
Ben Broocks

21