# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| **Alexander E. Jones** | § | **Bankruptcy Case No. 25-33553** |
| **Debtor** | § | |
| | § | |
| | § | |
| **ALEXANDER E. JONES AND** | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | |
| *Appellants,* | § | |
| | § | **Civil Action No. 4:25-cv-05553** |
| **v.** | | |
| **Neil Heslin, et al.** | | |
| **Appellees** | | |

**APPELLANTS' MOTION FOR RESETTING APPEAL HEARING TO ALLOW FILING OF APPELLANTS' REPLY BRIEF AND FOR FURTHER DISCOVERY** [1]

---

[1] To the extent such is necessary, the Court should consider this an objection to the matters in its May 4 Order and as to the matters herein set forth.

**Table of Contents**

| I | INTRODUCTION | 7 |

| II | APPELLANTS HAVE A RIGHT TO FILE A REPLY BRIEF BY VIRTUE OF THIS COURT'S ORDER OF MARCH 27, 2026 WHICH ALSO EMBODIES A BINDING "RULE 11" AGREEMENT WHICH THIS COURT CANNOT IGNORE | 7 |

| III | VERY BRIEF BUT NECESSARY BACKGROUND | 9 |

A    *THE CONNECTICUT PLAINTIFFS*    9

B    *The Texas A Plaintiffs.*    11

C    *The Texas B Plaintiffs*    12

D    *APPELLANTS BANKRUPTCIES AND TRANSFER OF FSS ASSETS TO THE JONES BANKRUPTCY ESTATE*    12

| IV | APPELLANTS NEVER SAID ALL BRIEFING WAS COMPLETE | 21 |

| V | THE APPELLATE ARGUMENT SHOULD BE AFTER APPELLANTS FILE THEIR REPLY AND IT SHOULD BE LIVE NOT BY ZOOM | 22 |

| VI | THIS COURT SHOULD ORDER PRODUCTION OF THE SO-CALLED SETTLEMENT AGREEMENT THAT THE ONCE ANTAGONISTIC PLAINTIFFS HAVE ENTERED | 23 |

CONCLUSION AND PRAYER FOR RELIEF    24

**Table of Authorities**

*Condit Chemical & Grain Co. v. Helena Chemical Corp.*, 8
  789 F.2d 1101 (5th Cir.1986)

*Griggs v. Provident Consumer Disc. Co.*, 17
  459 U.S. 56, 58 (1982)

*Lafferty v. Jones*, 10
  229 Conn. App. 487, 508 n. 24 (Conn. App. 2024) cert. denied, 351 Conn.
  923, 333 A.3d 105 (2025), and cert. denied, 351 Conn. 923, 333 A.3d 106
  (2025), cert. denied, U.S. , 146 S. Ct. 301, 223 L. Ed. 2d 124 (2025).

*Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 18
  666 F.2d 754, 758 (2d Cir. 1981).

*New York Times Co. v. Sullivan*, 9
  376 U.S. 254, 271(1964)

*In re Transtexas Gas Corp. v. TransTexas Gas*,
  303 F.3d 571 (5th Cir. 2002)

11 U.S.C. §349(b) 13

**STATEMENT OF THE NATURE OF THE CASE AND STAGE OF PROCEEDINGS.**

The case itself is an appeal from bankruptcy court orders improvidently entered. The Appellants have filed their Opening Brief (Docket Entry No. 5) and Appellees have filed their Response (Docket Entry No. 12). Appellants Reply is due May 18, 2026.

**STATEMENT OF THE ISSUES TO BE RULED ON.**

By Rule 11 stipulation of the Parties and written order of this Court, Appellees were allowed an extension to file their Response (Docket Entry No. 8), which they did, and Appellants were given until May 18, 2026 to file their Reply brief. In opposition to emergency relief Appellants sought, which was withdrawn the same day, Appellees filed an Objection to that emergency relief, which this Court interpreted as a request to expedite the appeal, which this Court granted setting oral arguments via zoom for May 8, four days after its order. In so doing, this Court has effectively denied Appellants' their right to file a Reply brief. This Motion requests that that:

1. This Court revise its Order of May 4 to reaffirm that Appellants are permitted to file a Reply brief on or before May 18, 2026, in accordance with what its Scheduling Order and the agreement and stipulation of the Parties;

2. The oral argument in this appeal occur expeditiously thereafter as the Court's calendar permits; [2]

3. The oral arguments be live and not via zoom (although any counsel wishing to participate by zoom should be permitted to do so); and

4. The Appellees be ordered to produce their so-called Settlement Agreement within seven days hereof.

---

[2] The Austin Court of Appeals ordered the trial court to conduct an evidentiary hearing on bonding matters concerning the collection efforts of the Texas A Plaintiffs, on or before May 29, 2026. See Exhibit 2. The trial court has scheduled that hearing for May 28, 2026 and therefore Appellants request that the rescheduled oral arguments not be for May 27 or 28.

**SHORT SUMMARY OF ARGUMENT.**

Appellants contend that they are entitled to file reply brief by virtue of a rule of agreement in order of this court. To deny them the right to file a reply brief violates the agreement of the parties and this court orders. Furthermore, appellant contend that discord has been misled by the numerous misstatements found in Appellees Objection and those misstatements in the Objection and also the many others in Appellees' Response, necessitate Appellants be permitted to file a Reply. Without this, neither this Court nor justice will be served.

Additionally, with this document intensive case, the complexity of the issues and the number of counsel involved, an appellate argument via zoom will not be effective. Thus Appellants request that after filing their Reply, the Court expeditiously set oral argument to be live at a time of the Court's convenience.

Finally, it has now become clear that three different groupings of Appellees with differing interests have entered into a Settlement Agreement that was not disclosed to the bankruptcy court, but will have an impact on this appeal, and thus should be produced.

## I.    INTRODUCTION

For the reasons hereafter set forth, Alex Jones ("Jones") and his wholly owned company, Free Speech Systems, LLC ("FSS")  request that the May 8, 2026 hearing set by this Court's Order (Docket Entry No. 21), entered and received yesterday, May 4, 2026, be continued to allow Appellants to file their Reply brief and that such be a live hearing, not via Zoom.  Jones and FSS are herein called Appellants.  While Appellants very much are in favor of and appreciate the Court's willingness to expedite this appeal, certain due process considerations mandate that the hearing be postponed allowing Appellants to file their Reply brief and that arguments on this appeal be conducted live not by zoom.

## II.    APPELLANTS HAVE A RIGHT TO FILE A REPLY BRIEF BY VIRTUE OF THIS COURT'S ORDER OF MARCH 27, 2026 WHICH ALSO EMBODIES A BINDING "RULE 11" AGREEMENT WHICH THIS COURT CANNOT IGNORE

This Motion addresses this Court's May 4 Order.  The genesis of this appears to be that on April 29, Appellants filed a motion for expedited relief to enjoin turnover proceedings in Texas state court. (Docket Entry No. 13).  Later that day the Austin Court of Appeals entered its own orders staying the turnover matters being pursued by Appellees.  Exhibit 2 hereto.  Appellants then filed a notice withdrawing their request. (Docket Entry No. 13).  After Appellants Motion was withdrawn, Appellees nevertheless filed an Objection to Appellants' request (herein called the "Objection").  (Docket Entry No. 20).  This Court's May 4 Order states that it construed Appellees Objection as a motion to expedite the appeal, which it granted setting oral arguments for this Friday, May 8 to occur via zoom, depriving Appellants of their right to file a Reply Brief.   It is respectfully submitted that the Court has been misled by the Objection and should not deprive either the Appellants or itself of a Reply which Appellants are entitled to file.

A little over 30 days ago, on March 27, 2026, this Court signed an agreed order embodying a "Rule 11" agreement of the Parties ("Scheduling Order") (Docket Entry No. 8). That Scheduling Order and the agreement it reflects, must be honored and enforced. The agreement embodying the Scheduling Order granted Appellees a 30-day extension to file their opening Response, changing Appellees' Response due dates from March 27 to April 27. The Appellees were in no hurry. By the Parties' agreement and this Court's Scheduling Order, Appellants' Reply Brief filing deadline was set at May 18, 2026:

> IT IS HEREBY ORDERED THAT:
>
> 1. The Sandy Hook Families' new deadline to file their response brief, as Appellees, is extended by agreement to April 27, 2026.
>
> 2. Jones's and FSS's reply brief, as Appellants, is due on May 18, 2026.
>
> 3. The Parties' rights are reserved with respect to any additional briefing to the extent allowed under applicable law, rules and this Court's procedures.

Appellees' Response was filed on April 27 (Docket Entry No. 12) (herein called the "Response") Appellees have received the benefits of that agreement and now seek to deprive Appellants of what they were to receive thereunder. Appellants have not waived or agreed to forego their right to file a Reply. And given the scope of the misstatements and omissions contained in their Objection on which this Court seems to have relied as well as Appellees' just-filed Response, a Reply is mandated to ensure justice is done. As this was a stipulation and agreement of the parties, entered in this Court's records, it also constitutes a valid and binding "Rule11" agreement which this Court should enforce.

The Fifth Circuit has held that Texas Rule 11 is nonetheless also a rule of substance akin to the parol evidence rule and applicable for that reason to Texas diversity cases tried in our federal court system. *Condit Chemical & Grain Co. v. Helena Chemical Corp.*, 789 F.2d 1101 (5th

Cir.1986). No cases have been found applying this to appeals but logic and equity necessitate its application here.

Due process rights, the agreement of the Parties and this Court's Scheduling Order all mandate that Appellants be given until May 18 to file their Reply, before oral argument occurs.

**III.      VERY BRIEF BUT NECESSARY BACKGROUND**

A very brief bit of background is vital here to demonstrate the importance of not depriving Appellants of their previously ordered right to file a Reply and why argument on this should be live, not zoom.

*A. THE CONNECTICUT PLAINTIFFS*

The term "Sandy Hook Families is a misleading term as the Appellees actually consist of three separate groups of 20 Plaintiffs who break themselves into two classes. It should actually be three classes. The first are self-identified as the "Connecticut Families," who are 15 Plaintiffs that sued Appellants in Connecticut. One is an FBI agent (Aldenberg) with no relation to any victim -- hardly a "family member." The other 14 are an aggregation of siblings, adult children and parents of 6 of the 26 Sandy Hook victims. As Appellants are media defendants who were covering a matter of public concern, in a suit brought by public figure plaintiffs, by Supreme Court mandate Appellants were to be afforded the highest levels of Constitutional protection, which included the requirements that the Plaintiffs themselves prove (a) the precise content of any statements that allegedly defamed them, (b) their falsity and (c) that the speaker had actual knowledge of their falsity (called malice). The Plaintiffs were required to prove all of these, with elements (b) and (c) requiring proof by clear and convincing evidence. *New York Times Co. v. Sullivan*, 376 U.S. 254, 271(1964) ("The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and

especially one that puts the burden of proving truth on the speaker."). None of these things happened.

Notwithstanding the Supreme Court unwaivable requirements, the Connecticut Plaintiffs received a post-answer default judgment against Appellants where the trial court struck every one of Appellants' constitutional arguments and defenses and instead decreed that every allegation the Connecticut Plaintiffs made were true. As such Appellants were judicially decreed liable even for acts committed by total strangers, simply because the Plaintiffs alleged it. A damages-only jury was instructed as such and entered awards for these 15 Plaintiffs,

- for approximately $1,000,000,000 total in compensatory damages (all "soft damages" of loss of reputation and emotional distress) for a per-plaintiff average of approximately $66,666,666;

- approximately $500MM in total punitives for a per-plaintiff average of $33,000,000;

- for a total award of approximately $1.5B, or a per-plaintiff award of $100,000,000.

The Connecticut Court of Appeals refused to consider the Constitutional arguments, asserting they were waived through inadequate briefing by prior counsel. [3] Both the Connecticut Supreme Court and the US Supreme Court denied cert.

The Supreme Court and the Fifth Circuit are in agreement that in cases involving First Amendment issues, "an appellate court has an **obligation** to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *X Corp. v. Media Matters for Am.*, 120 F.4th 190, 197 (5th Cir. 2024 (per curiam); *Snyder v. Phelps*, 562 U.S. 443, 453-454 (2011) (C.J. Roberts). **As to the**

---

[3] *Lafferty v. Jones*, 229 Conn. App. 487, 508 n. 24 (Conn. App. 2024) cert. denied, 351 Conn. 923, 333 A.3d 105 (2025), and cert. denied, 351 Conn. 923, 333 A.3d 106 (2025), cert. denied, U.S. , 146 S. Ct. 301, 223 L. Ed. 2d 124 (2025). The undersigned counsel did not get involved until after the Connecticut Court of Appeals briefing and argument had occurred.

**claims of the Connecticut Plaintiffs, this has never been done,** which may play a role in the determinations of the Texas appellate courts' refusals to allow the Connecticut Plaintiffs to proceed with their collection efforts.

B. *The Texas A Plaintiffs.*

The so-called "Texas Families" should be subdivided with the first group being Neil Heslin and Scarlett Lewis who although called "Texas Families," are actually residents of Connecticut that merely sued in Texas state court. They are called the "*Texas A Plaintiffs.*" As with the Connecticut Plaintiffs' claims, the Texas A Plaintiffs' claims arose from Appellants' reporting of the Sandy Hook tragedy. Also like the Connecticut Plaintiffs, the Texas A Plaintiffs got a post-answer default judgment entered in part explicitly, and improperly, because of the Connecticut default. Helsin sued for defamation and intentional infliction of emotional distress (IIED) and Lewis sued only for IIED. They were awarded

- approximately $4,000,000 total in compensatory damages (all "soft damages" of loss of reputation and emotional distress) for a per-plaintiff average of $2,000,000;

- approximately $45,000,000 in total punitives for a per-plaintiff average of approximately $22,500,000; [4]

- for a total award of approximately $50,000,000, or a per-plaintiff award of $25,000,000.

That award is currently on appeal to the Austin Court of Appeals where oral arguments occurred in May 2025 and the parties are awaiting the Austin Court's opinion. [5] Unlike the Connecticut courts, it is believed that the Austin Court is very much reviewing all transcripts. [6]

---

[4] Among the other myriad of errors committed by the trial court in Texas, the trial court allowed the Texas A Plaintiffs a post-trial pleading amendment to assert the Texas A Plaintiffs were somehow emotionally handicapped so they could circumvent the statutory punitive damages cap of $750,000 each.

[5] *Alex E. Jones, et al. v. Neil Heslin, et al.,* in the Court of Appeals for the Third District of Texas, Case No. 03-23-00209-CV. The undersigned counsel were not involved in the trial in Texas.

[6] At oral argument in the appeal regarding the Texas A Plaintiffs, it was particularly significant that the Texas trial court had entered a liability decreeing default judgment stating that everything the Texas A Plaintiffs had pleaded

C. *The Texas B Plaintiffs.*

The remaining three plaintiffs are called the Texas B Plaintiffs because they have yet to try their cases and have no judgments. Appellees' Response identifies these three as Leonard Pozner, Veronique De Lia Rosa, and the Estate of Marcel Fontaine, with Pozner and De La Rosa believed to be living in Florida and Marcel Fontaine (who has apparently passed away) is believed to be a former resident of Massachusetts. By their own statement, Fontaine's claims have nothing to do with Sandy Hook. See Response (Docket Entry No. 12, p. 3, n.3).

The fact that "identical twin" cases resulted in such a disparity in average compensatory damage awards of $66,666,666 per Connecticut Plaintiff and $2,000,000 per Texas Plaintiff -- Connecticut plaintiffs receiving over 33 times a greater compensatory damage award -- raises very significant equal protection/due process concerns which may also play a role in the willingness of the Texas appellate courts to allow collection actions to begin. These constitutional issues, coupled with the Connecticut courts' disregard of the First Amendment protections, may be causing the Texas courts to determine that judgments that so fundamentally violate the Constitution, also violate Texas public policy and are not enforceable here.

D. *APPELLANTS BANKRUPTCIES AND TRANSFER OF FSS ASSETS TO THE JONES BANKRUPTCY ESTATE*

In both their Objection and their Response, Appellees badly misrepresenting the underlying events to this Court as they have to the Austin Court of Appeals and the Texas Supreme Court, and this presumably is another reason why the appellate courts have slowed the process down for careful examination as this Court should. The Appellees' Objection (Docket Entry No. 20), which seems to have factored into this Court's Order of May 4, like their Response brief is littered with

---

Appellants said, had in fact been said, when most of the articles did not state what was claimed -- it was not even close -- and in one article Jones explicitly said the exact opposite. The Connecticut appellate courts were not so concerned.

misstatements and omissions that Appellants are concerned may have influenced this Court. For example, their Objection falsely advises this Court that this case is a simple one where FSS was dismissed from bankruptcy, and they claim it is therefore "indisputable that, upon dismissal the automatic stay no longer applies." Here is precisely what they have told this Court at pp 4-5 of their Objection:

> The underlying issue for this Court is simple: whether the automatic stay applicable to the bankruptcy estate of Jones in his individual capacity covers the assets of FSS. FSS is an entirely separate legal entity whose bankruptcy case has been dismissed. It is indisputable that, upon dismissal of FSS's bankruptcy case, the automatic stay no longer protects the assets formerly belonging to that estate. *See* Appellees' Br. at 8–9; ROA.003396-99. It is also indisputable that the automatic stay in Jones's bankruptcy case does not apply to the FSS Assets, even if Jones owns FSS's equity. Appellees' Br. at 23–25. Jones cannot argue otherwise. Instead,

The Plaintiffs know this is false and Appellants are concerned it may have misled this Court. To the contrary, Appellees know full well that when Judge Lopez dismissed FSS from bankrtuptcy by order dated June 21, 2024 [FSS BK Dkt. 956 [7]] (the "June Order") at the same time it transferred FSS assets to the Jones Bankruptcy Estate pursuant to 11 U.S.C. §349(b) which states:

---

[7] This Motion references hearing orders, hearing transcripts and other matters on file in: (1) the bankruptcy filed by FSS in the United States Bankruptcy Court for the Southern District of Texas in Case No. 22-60043 (the "FSS BK "); (2) the bankruptcy filed by Jones presently pending in Case No. 22- 33553 (the "Jones BK"); (3) the appeal of the September Order by the Texas Plaintiffs to the United States District Court in Case No. 24-cv-03882; and (4) a matter initially filed in the Texas state court on or around August 2024, which was removed to the US District Court for the Western District of Texas in case no. 24-cv-01198, Dkt.13 which was by stipulation transferred to the bankrtuptcy court in Houston. Because they are more numerous, docket citations from Jones BK case will be indicated by "Dkt.__" whereas the smaller number of docket citations from FSS BK will be noted as "FSS BK Dkt.__."

**§ 349. Effect of dismissal**

\*\*\*

((b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title [11 USCS § 742]—

    \*\*\*

      (3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title

They do not mention this. Virtually immediately after the bankruptcy court issued its June Order, the Texas A Plaintiffs who were then completely antagonistic with the Connecticut Plaintiffs, went to the Texas state court seeking a turnover of FSS's assets --- the very ones the June Order conveyed to the Estate. The bankruptcy trustee (herein called the "BK Trustee") as well as the Connecticut Plaintiffs vigorously protested. The BK Trustee then removed the matter to the bankruptcy court and filed a motion (a) claiming that such actions violated the automatic stay and (b) asking for confirmation the stay applied to all FSS assets. [Dkt.720]. This led to a contentious hearing before Bankruptcy Judge Lopez who rebuked the Texas Plaintiffs for violating his June Order. [Dkt.721].

The BK Trustee determined that given his ownership of the FSS assets by virtue of the June Order, he wanted to auction of FSS assets and thus filed a motion for permission to do so [Dkt.829] which is required before any bankruptcy trustee can dispose of assets of a bankruptcy estate. While Connecticut Plaintiffs supported this proposed sale of FSS assets by the BK Trustee, the Office of the United States Trustee objected claiming that while the BK Trustee for the Estate may own 100% of the FSS membership interest, this did not translate into ownership of FSS assets. [Dkt.845, p. 2, ¶3]. To address this objection, a hearing occurred on September 24, 2024 [Dkt. 861] where Judge Lopez emphasized that in signing the June Order, the bankruptcy court intended that all FSS assets be conveyed to the Jones Bankruptcy Estate, thus protected by the automatic stay. The following is a small sampling of excerpts from that hearing demonstrating that FSS assets had indeed been conveyed to the Jones Bankruptcy Estate:

**THE COURT**: It [*referring to FSS assets*] is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS. 541, **all legal or equitable interests. All. And all has got to mean all**....[p.16]

*****

**THE COURT**: No, no, it's not my interpretation.  It's Congress. Congress used the word all. **All legal and equitable interests of the debtor become property of the estate. All means all. And we can't shortchange what all means**. And -- and upon conversion unless otherwise ordered [*referring to §349*].... **And all has got to mean all. And we don't get to kind of pick and choose what all means**. .... [p.16-17].

*****

**THE COURT**: .... **But what I'm saying is it's already there. What you're asking for is belt and suspenders. Let's not act like it's not already there.....But what you're asking me for really is belt and suspenders**. [p.17-18].

*****

**THE COURT: That was always the intent. Right?**  ... **But I'm just saying that was always the intent. Everybody knew**. ..**I'm more than happy to clarify in my order that all the assets -- if it didn't include it in the assets, that's why he has the cash, right**? ... He's [*referring to the BK Trustee*] got everything. **That was always the intent as to what was going on**...**I just think we're getting in the technicalities here. But that certainly was what I ordered at the time**. [p.24]

******

**THE COURT**: **Unless otherwise ordered by the Court** [*referring to §349(b)*]. We don't have to get into what's unusual or not. Everything is case specific. ...I think that's why Congress gave everyone flexibility.... [p.25]:

*****

 **THE COURT**: Mr. Wolfshohl [*BK Trustee counsel*], what about that?... **I'm going to give you [*i.e., the BK Trustee*] all the assets of FSS. I'm going to clarify that that's what you [i*.e. the BK Trustee*] always had, the assets of FSS. And I just want to make sure that other people look at it so that no one then -- I sign something and then somebody comes in and asks me to reamend the order**... [p.26–27]

****

**THE COURT**: ... **And I feel like it's a clarifying order. It's not really amending the order** [i.*e. the June Order*]. Well, it's more -- I don't want to come up with bankruptcy terms for orders, but you know what I mean. It's more of a -- whether you can call it -- you can call it -- **I don't care what you call it. You can call it amended order or modified order, a clarifying order**.

**MR. WOLFSHOHL**: An order in furtherance. [p.27]

14

In his concluding remarks, Mr. Nguyen, counsel for the US Trustee summarized the need for an order making it completely clear that title to FSS assets had been vested in the Estate as §541 property under §349 by virtue of the June Order, stating [p.26]:

> MR. NGUYEN: Your Honor, if you clarify the order to include all of FSS hard assets as property of the estate, the U.S. Trustee won't have any objection. I think you are able -- you have discretion under 349 to order otherwise. As long as that order is clear, we're fine with that.

The resulting Order entered in September 2024 [FSS BK Dkt. 1021] (the "September Order") confirmed that in the June Order, the court had exercised its discretion to vest all FSS property §541 property of the Estate pursuant to §349(b), stating

> 1. Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

Yet neither their Objection nor Response makes any mention of this, instead falsely telling this Court that FSS's dismissal from bankruptcy ended the matter. Furthering their deceptions on this Court in their Objection and Response, immediately after entry of the September Order, in October 2024, the Texas A Plaintiffs appealed the September Order to the District court, stating the issue was the propriety of the transfer of FSS assets:

> **STATEMENT OF ISSUES**
>
> 1.    Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

[FSS BK Dkt. 1033]. The Connecticut Plaintiffs who intervened in that appeal wrote in their intervention filing that the June Order had indeed conveyed FSS assets to the Jones BK Estate and that the September Order merely clarified that conveyance [Case no.24-03882, Dkt.8]:

> 14.    On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket. (Bankr. Dkt. 1021). This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee. *Id.*

That appeal lasted until 5/6/25, when the Connecticut and Texas A Plaintiffs jointly filed a stipulation of dismissal of the September Order Appeal [Case no. 24-03882, Dkt.22] at which time the September Order became a final unappealable judgment that cannot be collaterally attacked or challenged. The Objection does not mention this and their Response does so in one footnote, only to mention it occurred, not to address the massive significance of their appeal.

However, as Appellees well know but hide from this Court, is the absolute fact that during the pendency of their own appeal -- from 10/11/24 until 5/6/25 -- the bankruptcy court lost any jurisdictional capacity to say or do anything that would have an effect on the September Order. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), which loss of jurisdiction has

been repeated by the Fifth Circuit. *In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571 (5th Cir. 2002).

And even more importantly, neither their Objection nor Response addresses the fact that once that appeal of the September Order was dismissed, it became a final order that could not be modified even by Judge Lopez himself, except by Bankruptcy Rule 9024, which incorporates FRCP 60. *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754, 758 (2d Cir. 1981).

Further hidden from the Court is the fact that in August 1, 2024, the Connecticut Plaintiffs attempted to domesticate their Connecticut Judgment in Texas and that was removed to federal court in Austin and by agreement later transferred to the bankruptcy court in Houston. In filings before the transfer to Houston, the Connecticut Plaintiffs vigorously protested FSS's accusation in the removal papers that the automatic stay had been violated. The Connecticut Plaintiffs assured the federal courts they knew the automatic stay was in effect on FSS assets and intended to honor it, the Connecticut Plaintiffs writing: [8]

> The Turnover Application was overt in its acknowledgment of the pending bankruptcy and related issues, detailing for the State Court that:
>
> ****
>
> - "Alex Jones' Chapter 7 bankruptcy Estate, including all the assets of Free Speech Systems, LLC, are protected by the Bankruptcy Court's automatic stay, and Judgment Creditors do **not** seek any relief that would violate that stay or with respect to assets that are included in the Chapter 7 bankruptcy Estate and are thus available to satisfy the Judgment."

---

[8] This filing appears in Case No. 24-cv-01198, Dkt.13 in the United States District Court for the Western District of Texas. Later by stipulation it was transferred to the bankruptcy court in Houston. Dkt.16

To emphasize that Plaintiffs know the June Order alone effectuated the transfer of FSS assets and that was re-affirmed by the September Order, the Joint Application for turnover now on appeal in Texas, filed in June 2025 for the Connecticut and Texas A Plaintiffs ("Joint Application") itself recites the Trustee's rights to FSS assets arose from the June Order (pink highlight):

> 2.    In the Free Speech Systems, LLC Chapter 11 Case, the Bankruptcy Court for the Southern District of Texas issued an order dismissing the case and vesting authority in the Trustee in the Jones Chapter 7 Case (the Trustee) to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024). Accordingly, this Application only seeks relief relating to Judgment Debtor Free Speech Systems, LLC if approved by the Trustee in the Jones Chapter 7 Case.

Yet Appellees' Objection (Docket Entry No. 20) continues to falsely tell this Court, and other courts, that in February and March of 2025, while the Texas A Plaintiffs' appeal of the September Order was still pending, the bankruptcy court held the September Order "null and void":

> Jones has filed multiple briefs in several courts arguing that the Bankruptcy Court entered orders extending the automatic stay applicable in Jones's individual case to the FSS Assets. The Bankruptcy Court has done no such thing—instead, it has repeatedly affirmed that *the automatic stay does not apply to the FSS Assets.* ROA.003396-99 (February 5, 2025 Hearing); ROA.003352 (March 19, 2025 Null and Void Order); ROA.006773 (October 1, 2025 Hearing); ROA.006748-49 (October 1, 2025 Order); ROA.006878 (Denial of Reconsideration of October 1,

Objection, p. 6. They omit to disclose and certainly not discuss the fact that the appeal they filed deprived the bankruptcy court of any jurisdiction to so hold in February and March -- a fact which the bankruptcy court itself acknowledged at a hearing in June 2025, which June hearing the Appellees also do not even mention. At that June 2025 hearing, bankruptcy judge Lopez himself declared his lack of jurisdiction to issue orders affecting the September Order, including the very ones the Objection references:

somebody wants to buy the equity, which someone can always do in Chapter 7. I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets. And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me. It would have to be cash only and we'd have to sort out all the intellectual property issues. So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

[Dkt. 1193, p. 40]. It is beyond implausible to take the statement "so I couldn't revoke one way or the other" and then add: "but I could construe it as null and void." Yet that is what the Appellees attempt to foist on this Court in their Objection. [9]

And these are just a few of the many examples where the Appellees have exhibited a complete lack of candor with this Court especially in their Emergency Objection (Docket Entry No. 20) which Appellants are concerned has prompted this Court to deny Appellants the right to a Reply brief and effectively truncate the appeal proceedings. Their Response is even worse, and that is a reason why allowing Appellants their right to a Reply is absolutely crucial. Appellees have unsuccessfully attempted to foist these same canards on the Texas courts, which no doubt have caused the state appellate courts to slow the process down to make sure they are acting on accurate information, which the Appellees are not supplying.

### IV.    APPELLANTS NEVER SAID ALL BRIEFING WAS COMPLETE

As another example of Plaintiffs' lack of candor with this Court, their Emergency Objection (Docket Entry No. 20) which Appellants are concerned was the catalyst of this Court's Order that deprives Appellants of their absolute right to file a Reply, the Appellees falsely tell this Court that all briefing in this appeal has been completed even though Appellants have not filed their Reply [Objection at p. 6]:

> As Jones's Motion for Injunction states, the parties' positions "are fully briefed." Mot. at 9. The Court has all the necessary information to rule on both the Motion for Injunction and the Appellees' Brief, and the Sandy Hook Families urge

---

[9] And even if the bankruptcy court did conclude that the September Order was "null and void" that that somehow magically re-conveyed FSS assets that the court had conveyed pursuant §349, is simply ludicrous. Further, for the bankruptcy court to state in June 2025 that "Trustee is going to have to think about whether I approve any sale process..." clearly shows nothing was declared "null and void" as the Plaintiffs now tell this Court.

They know this is flat wrong. To the contrary, Appellants only said ***Appellees' positions were fully developed*** given their then-just filed Response brief, Appellants stating:

> Appellants filed their Opening Brief on March 3, 2026. Appellees, who now appear to include not only the Connecticut Plaintiffs and the Texas A Plaintiffs, but also the Texas B Plaintiffs, filed their Response Brief on Monday, April 27, 2026. Hence their positions are fully briefed developed. [8]

And footnote 8 plainly states Appellants' Reply brief was not yet due and would be filed:

_____
[8] Although Appellants' Reply brief is not yet due.

Therefore, while Appellants very much appreciate this Court's decision to expedite this appeal, they nevertheless request that such hearing not occur until after they have filed their Reply, which is by this Court's order due May 18. In fact, it would be a denial of Appellants' due process rights to not allow them to file their Reply which the Parties' agreement, and this Court's Order of March 27 plainly states.

## V. THE APPELLATE ARGUMENT SHOULD BE AFTER APPELLANTS FILE THEIR REPLY AND IT SHOULD BE LIVE NOT BY ZOOM

When the appellate argument in this case occurs after Appellants file their Reply, it should be live and not by zoom. First, a live hearing is in order because of the obvious and sweeping misstatements in their Objection and Response, and the numerous documents in the record that will require discussion presentation. The undersigned counsel has conducted several zoom appellate arguments, and they are not nearly as productive as live hearings.

Also given the large number of attorneys who are filing pro hac motions, a zoom hearing will surely be more chaotic and much less likely to be of benefit to the Court.

Appellants therefore respectfully request that such hearing be live and not via Zoom.

### VI. THIS COURT SHOULD ORDER PRODUCTION OF THE SO-CALLED SETTLEMENT AGREEMENT THAT THE ONCE ANTAGONISTIC PLAINTIFFS HAVE ENTERED

As a final matter, as is immediately apparent, for most of the time while these matters were pending, the Connecticut and Texas Plaintiffs were very much at loggerheads. The 15 Connecticut Plaintiffs had what FSS asserts is an unconstitutional judgment in the amount of approximately $1.5B, the two Texas A Plaintiffs had approximately $50M in judgments and three other Texas B Plaintiffs had yet to try their cases and thus had no judgments. On judgments alone, the split as between the Connecticut and Texas A Plaintiffs regarding FSS assets was thus 97% Connecticut vs 3% Texas. The Texas A Plaintiffs, on the other hand, contended that the split should be 75/25% because there were 15 Connecticut Plaintiffs and five Texas Plaintiffs (even though three of the five Texas B Plaintiffs had sued in Texas but their cases had not been tried). The Texas Plaintiffs argued that the cases in Connecticut and Texas were essentially "identical twins" as (a) both were based on alleged Sandy Hook reporting and (b) liability-decreeing defaults had been entered in all cases.

Because of this, the Texas Plaintiffs told the Connecticut Plaintiffs to the effect that they would blow the whistle in bankruptcy court and argue that the Connecticut judgment was in some means oversized and/or invalid if the Connecticut judgment was not shared. This bankruptcy fraud resulted in a "settlement agreement," which no one has seen, among the Connecticut Plaintiffs, the two judgment holding Texas A Plaintiffs, and three Texas B Plaintiffs whose cases were yet to try. Attorney Bankston told the state trial court as much when the original turnover/receiver orders were being sought in August 2025, Bankston stating the following:

MR. BANKSTON: One last thing, just because I haven't put it on the record yet, hasn't been announced in open court, is that the Heslin Plaintiffs as well as the Pozner Plaintiffs, Mr. Fontaine's estate representative, are all in a settlement agreement and joint --

THE COURT: I assumed that.

MR. BANKSTON: So that's -- just so that that's on the record, we're all united on that.

THE COURT: So, I used to do false claims act cases for relators and for the government, and those are -- I'm familiar with the concept and I assumed you wouldn't be here.

MR. BANKSTON: Otherwise.

THE COURT: Right.

MR. BANKSTON: That's right. Thank you,

Exhibit 1, p.19. Notably, as there was nothing to "settle" among these Plaintiffs, the question thus raised is why the Connecticut Plaintiffs conveyed 25% of their judgment, which in face value is over $375,000,000, to the Texas Plaintiffs who only have among them $50,000,000 (which amount is quite likely to be reduced to zero). The quid pro quo for this "settlement" is believed to be a part of a fraud perpetrated on the bankruptcy court. This Court should not allow itself to be an unwitting participant in that fraud.

Appellants therefore respectfully request that prior to the hearing in this matter that the Plaintiffs be ordered to produce that settlement agreement.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Appellants request that:

a. This Court revise its Order of May 4 to reaffirm that Appellants are permitted to file a Reply brief on or before May 18, 2026, in accordance with what its Scheduling Order and the agreement and stipulation of the Parties;

b.  The oral argument in this appeal occur expeditiously thereafter as the Court's calendar permits; [10]

c.  The oral arguments be live and not via zoom (although any counsel wishing to participate by zoom should be permitted to do so); and

d.  The Appellees be ordered to produce their so-called Settlement Agreement within seven days hereof.

Dated:  May 5, 2026

Respectfully submitted,

*/s/ Ben C Broocks*

Ben C Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
State Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com

Shelby A. Jordan
State Bar No. 11016700
Federal Bar No. 2195
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, PC.**

500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas, 78401
Phone: (361) 884-5678
Fax:     (361) 888-5555
Email:  sjordan@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**CO-COUNSEL FOR APPELLANTS**

---

[10] The Austin Court of Appeals ordered the trial court to conduct an evidentiary hearing on bonding matters concerning the collection efforts of the Texas A Plaintiffs, on or before May 29, 2026.  See Exhibit 2.  The trial court has scheduled that hearing for May 28, 2026 and therefore Appellants request that the rescheduled oral arguments not be for May 27 or 28.

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2026, a true and correct copy of the foregoing document was sent via electronic mail to all counsel and parties listed on the Court's ECF filing system.

*/s/ Ben Broocks*

Ben Broocks

EXHIBIT 1    1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| | ) | |
| ALEX JONES AND FREE SPEECH SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants | ) | 459TH JUDICIAL DISTRICT |

-----------------------------------------------------

**EX PARTE MOTION TO APPOINT RECEIVER,**

**MOTION FOR TURNOVER**

-----------------------------------------------------

On the 13th day of August, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Maya Guerra Gamble, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

EXHIBIT 1

2

A P P E A R A N C E S

**ON BEHALF OF PLAINTIFFS**

    Mark D. Bankston
    SBOT NO. 24071066
    Kaster Lynch Farrar & Ball, LLP
    1117 Herkimer Street
    Houston, Texas  77008
    (713) 221-8300

    AVI MOSHENBERG
    State Bar No. 24083532
    LAWSON & MOSHENBERG PLLC
    2301 Commerce Street, Suite 200
    Houston, Texas  77002
    (713) 449-9644

    RYAN E. CHAPPLE
    State Bar No. 24036354
    CAIN & SKARNULIS PLLC
    303 Colorado Street, Suite 2850
    Austin, Texas  78701
    (512) 477-5000

**ON BEHALF OF DEFENDANTS**

    BEN C. BROOCKS
    State Bar No. 03058800
    WILLIAM A. BROOCKS
    State Bar No. 25107577
    BROOCKS LAW FIRM PLLC
    248 Addie Roy Rd., Suite B-301
    Austin, Texas  78746
    (512) 201-2002

    SHELBY A. JORDAN
    State Bar No. 11016700
    JORDAN & ORTIZ, P.C.
    300 N. Shoreline Blvd., Suite 804
    Corpus Christi, Texas 78401
    (361) 884-5678

    ALAN DAUGHTRY
    State Bar No.00793583
    Attorney at Law
    3355 W. Alabama, Suite 444
    Houston, TX 77098
    (281) 300-5202

EXHIBIT 1   3

**PROCEEDINGS**

*(The following proceedings were held in open court)*

THE COURT:  D-1-GN-18-001835, Heslin and Lewis versus Free Speech Systems and Jones.

Announcements for the record, please.

MR. BANKSTON:  Good afternoon, Your Honor, good to be back.  Mark Bankston on behalf of the Plaintiffs, Neil Heslin and Scarlet Lewis.  I'm joined today by Avi Moshenberg, also my co-counsel for the Heslin Plaintiffs.  And we're also joined today by the Ryan Chapple.

THE COURT:  Oh, okay.  And that's everybody in Connecticut?

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.  And can you spell Chapple for me?

MR. CHAPPLE:  Yes, ma'am.  C-H-A-P-P-L-E.

THE COURT:  P-P-L-E.

MR. CHAPPLE:  Correct.

THE COURT:  It's a good thing I asked, because I wouldn't have done that.

MR. BROOCKS:  Your Honor, Ben Broocks, my colleague William Broocks, Shelby Jordan, and Alan Daughtry for Jones and FSS.

THE COURT:  Okay, I missed the third

EXHIBIT 1

one's name.

MR. BROOCKS:  Shelby Jordan.  Shelby Jordan.

THE COURT:  Okay, that's not on here.

MR. BROOCKS:  And then Alan Daughtry.

THE COURT:  Also -- oh, no.

Shelby Jordan?

MR. BROOCKS:  Jordan, yes, ma'am.

THE COURT:  Like S-H-E-L-B-Y?

MR. BROOCKS:  Exactly right.

THE COURT:  Okay.  All right.

And we're here on --

*(Interruption in proceedings.)*

All right.  And you've announced for an hour?

MR. BANKSTON:  Well, Your Honor, it's sort of complicated.  We announced for an hour when it was requested as an ex parte hearing.  I know why Defendants are here, but that clearly was not factored into the time announcement.  I know you've got a busy day today.

THE COURT:  All right.  Did you announce?

MR. BROOCKS:  Well, Your Honor, we thought the rules would apply they would announce for us.  All the secrecy in reality comes without cause.

EXHIBIT 1    5

THE COURT: Okay. So, you do understand this is an ex parte motion and the law allows it to proceed ex parte. So, if you weren't here I wouldn't be worried about you. Right?

MR. BROOCKS: Right.

THE COURT: All right. Well, we'll see how it goes.

MR. BROOCKS: Thank you, Your Honor.

*(Other docket matter called)*

THE COURT: All right. Well, Mr. Bankston, are you going to handle the argument today or --

MR. BANKSTON: Sure. What we're actually going to be doing is there is a threshold issue that I'm going to need to talk to you about that will probably affect what we can and cannot do today. Then, when I'm done talking to you about that, then Mr. Chapple is going to be talking to you about the application itself and what we can do.

Okay, Your Honor. It's been a long time since I've been here.

THE COURT: I know.

MR. BANKSTON: And let me start here. We're going to need to talk about an appeal bond. I have stood here before a PowerPoint, I have this

EXHIBIT 1    6

feeling that often happens to me, it's happened a lot in this case, when I'm standing with a PowerPoint where I know I'm about to reveal to you litigation misconduct that you don't know anything about yet.

And when that first happened in this case, I will confess I had feelings of excitement about that, professional pride, all of those sorts of things I would feel when I'm about to do one of these PowerPoints. And I don't feel that anymore. I think you know, you knew two years ago, that I'm sick and tired of it. And I'm going to reveal some things to you today that, again, I'm very disturbed about.

What has happened is that, after our ex parte application was filed and Defendants found out about it somehow, there has been a flurry of filings. I know you don't know anything about them because they haven't been sent to you, but there have been a lot of things filed.

The first thing that happened is that FSS filed a paupers check of $10 to act as a bond preventing the collection of this Court's final judgment. Okay. That happened just a few days ago. FSS purports to provide a deposit under TRAP 24, which allows a debtor to supercede a judgment with a deposit not exceeding 50 percent of the debtor's net worth.

EXHIBIT 1    7

Already this is probably going to throw up some flags to you, because you've revisited this position many times. You'll remember that there was a request to modify the appeal bond and motion for new trial, you'll remember we've had a Braden hearing. This is something we've done often. But this is what they're doing, they put a $10 check.

Now, just real quickly, the legal standard on that is that a judgment debtor who does that has to provide an affidavit with certain information.

THE COURT: Slow down just a little bit.

MR. BANKSTON: Thank you. Thanks for the reminder.

And then the judgment creditor, they can then file a challenge. This just happened, so we're preparing a challenge to file right now. When we do that, then this Court must hold a hearing and issue an order about whether that bond affidavit is sufficient. Which we cannot do today.

THE COURT: Right.

MR. BANKSTON: We have to file a challenge to it. So, this has slowed things down yet again. All right, so we've got to do that challenge.

But we still need to talk about the

EXHIBIT 1    8

affidavit today, due to the ploy of new counsel.

So, as you see, we have new counsel again.  This would be 25?

THE COURT:  I don't know.  But I don't care anymore.  No -- nothing will be based on new counsel.

MR. BANKSTON:  Here there's nothing new about the strategies, okay.  Here is what has happened, this is counsel's ploy:  First, counsel filed an affidavit from Jones, claiming that FSS has no assets because they were vested in Alex Jones' bankruptcy trustee by judicial order.  That's what the affidavit says.  So, the filing of that affidavit stops the receivership in Heslin until the Court holds a hearing on Plaintiff's challenge.

But Defendant is also arguing regarding Lafferty.  Jones' new counsel claims that the factual averment in the affidavit prevents receivership in Lafferty.  Because, as you know, the appellate bond would not affect their interest in their judgment whatsoever.  But what they're saying is that, because an order vested all of FSS's assets into Alex Jones' bankruptcy trustee on judicial order, thus any act by this Court in receivership would violate a bankruptcy stay, thus the affidavit and its factual averments over

EXHIBIT 1    9

receivership in Lafferty. But that would only occur if this Court found today that the statements in the affidavit were true. They are not.

This is really disturbing, Your Honor, Okay? This is what they did. They got Alex Jones to sign this affidavit. And the affidavit says, all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alex Jones. And they say, because Judge Lopez of the Southern District Bankruptcy Court vested all ownership of all FSS cash and property of the estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets.

The affidavit cites to a bankruptcy order of September 25, 2024. This is what that order says. And it does say that: All property of the estate is vested in the bankruptcy estate and shall be under control of the estate. Looks good.

But what happened over the next year. The next entire year. You see, Judge Lopez had planned to liquidate FSS assets by placing them in the custody of Chris Murray, the Chapter 7 Trustee, who would then conduct an auction. Judge Lopez entered the September 2024 Supplemental Order to accomplish that purpose. That's what you're going to hear it referred

EXHIBIT 1    10

to as, "The Supplemental Order." Okay. But, as you probably saw, Judge Lopez was unsatisfied with the auction process, and thus he vacated the order and he prohibited its future use.

THE COURT: Which order?

MR. BANKSTON: The September.

THE COURT: The Supplemental Order?

MR. BANKSTON: The September -- in fact, I'll show it to you again. This September order right here that you see, that -- where Jones is now using that in an affidavit to say FSS has no assets, this order judicially vested them in the estate of Alex Jones. That order has been vacated. The bankruptcy court has prohibited its future use. And let me show you that.

This occurred, started up in a February 5th, 2025, hearing on something known as a 9019 motion. This is after the auction, in the eyes of Judge Lopez, has failed.

Judge Lopez says, I entered a Supplemental Order so that to ensure you have the Trustee cover that he could sell the assets. That's what the order was intended to do. The Trustee asked me for a specific order but it was only for one purpose, to see if he could sell the assets.

EXHIBIT 1    11

As a result, Judge Lopez concluded it was improper to use the Supplemental Order, which was used for one purpose and one purpose alone, and that purpose is now gone.  Gone.

Judge Lopez ruled that he would vacate that order because it serves no purpose:  I'm not allowing a sale of the assets anymore.

He ruled that you may consider any use of the Supplemental Order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  Judge Lopez noted, it would be erroneous to use the Supplemental Order for a purpose in which it was never intended. Now, he vacated that order to promote, quote, the finality of the bankruptcy process so that the families can pursue whatever it is they want in judgments in state court.  He said, there's nothing stopping anyone from pursuing any claims in Texas State court.  The bankruptcy has no impact.

In other words, the bankruptcy itself, is stayed.  There's no automatic stay stopping.  No one has to come to ask me for permission.  You have whatever rights you have.

What's really important here, Your Honor, because we're going to be coming back to you not only

EXHIBIT 1    12

on a challenge, because today we're just talking about the truth of the statement in the affidavit, we're going to have to challenge it for Heslin, right, but today we're just talking about the truth of the statement in the affidavit. We're going to have to bring in in Heslin also a motion for sanctions because of counsel's knowledge.

At that point, in February 2025, Judge Lopez had made it clear to Defendants and their counsel, the ones sitting right here, these are the ones who were in bankruptcy court in that hearing, has made it clear that that order is no longer in force. But less there was any doubt, there were two subsequent attempts at reconsideration.

Attempt Number 1: An entity known as FUAC, which is a Jones-allied company seeking to purchase InfoWars, sought reconsideration by filing a motion approving the sale of FSS assets. That motion attempted to revive the Supplemental Order.

Here is what Judge Lopez said in an order of March 19th: The Court said at a hearing on February 6th that parties should consider the Court's Supplemental Order null and void for the reasons stated at the hearing. Nothing has changed.

There was a second attempt. This attempt

EXHIBIT 1    13

was by the layers who are now in front of you.  Jones and FSS moved to reconsider Judge Lopez's vacatur of the September -- I mean the September Supplemental Order.  In their motion, Jones and FSS recognized that the Supplemental Order was no longer in effect.  They noted in a Supplemental Order entered on February 5th, this Court declared that the Supplemental Order was null and void.  This motion requests the reconsideration of that declaration.

The Defendants asked Judge Lopez to reverse course, and they argued that holding the position that the Supplemental Order is void will create past, present, and future chaos.  So, they requested that this court reconsider its prior rulings.  They know that September order is not real.  They know it is null and void.

Now, to be sure, they have problems with Judge Lopez vacating the order.  They think he's without authority to do it.  They have moved for reconsideration.  But that order still exists.  That has been vacated.

So, now you have counsel who has turned around and taken that order, which they know is null and void, and they have used it, given it to Alex Jones to say in an affidavit, which we're now once again

EXHIBIT 1    14

frustrated in the efforts to pursue this Court's final judgment, and they obviously gave it to Jones for a very specific reason: Because Jones can avoid perjury by just saying, well, I thought that's what was up, my lawyers tell told me that.

Now, what happened is that Jones' lawyers put a false statement in front of him and had him sign it. And they knew it was a false statement. And here is the thing, Your Honor, these attorneys are not -- this is not a mistake of ignorance. A mistake of an attorney being a bad attorney. These are smart attorneys. These attorneys know full well that I would be able to show you all this. They know that I will be able to show you where Judge Lopez vacated that order. They know that that's not live and that argument will get defeated. But they've accomplished the goal, which is we can't get a receivership for Heslin today.

And now they're going to be able to run around and do whatever they want until I can come back to this court and challenge this and get this process moving forward. And in the meantime they've enriched themselves by doing it. By doing the same thing every counsel before has done. And how many times have I come here with a lawyer who has given you false information. And how many times have you responded in

EXHIBIT 1    15

turn. And that these new lawyers do not believe that there's going to be any meaningful consequence for that. So, they give a false affidavit.

This is troubling for today, obviously. Because not having found success and convincing Judge Lopez to revise his Supplemental Order, Defendants counsel made a troubling decision: They pretended -- they decided to file a pleading in this court, pretending the vacatur of the Supplemental Order never happened.

Now, it would be one thing if you were you to say, hey, look, there's an order that puts all the assets in Jones. That order has been vacated, but we disagree with it and we're moving to reconsider it. If you were to tell the Court that, that's fine.

To tell the Court, here is an order it's in force, this prevents judgment, that's ridiculous. That's disgusting. And it's being profited off of. We can't do much about this today except that you can conclude today, you can conclude that that statement is false.

If that's the case, we have three requests for you, okay. This is how we think we can go forward today:

One is let's go ahead right now if we can

EXHIBIT 1

16

because we need to do this quick to not allow any malfeasance to happen in the meantime, set a hearing date for Plaintiff's challenge to the TRAP 24 affidavit of FSS, as well as Plaintiff's motions for sanctions and I will have those on file before the end of the week. By Friday those will be on file.

So, if we can get a hearing date, I know it is your usual practice to have the motion on file before we actually set the hearing date, I know dates are kind of hard to get right now, I would really like it if we could maybe set one today.

Second, something we haven't talked about yet, there's a notice of removal filed for Alex Jones. We'll deal with that in due course. When that gets back to you we'll have some things to say about that. But for right now, take no action on anything relating to Alex Jones. We don't want to mess around with the jurisdictional idea of it being removed, so nothing relating to Alex Jones.

Third, today, go forward today with hearing the Intervenor's application for turnover and receiver as to FSS. Because, as I say, I've removed this threshold issue for you, I've shown you that Judge Lopez, in fact, vacated that order, that's not a real order, FSS's assets are not vested in the Trustee.

EXHIBIT 1    17

Judge Lopez has said come here and come pursue your remedies. Mr. Chapple has some other things to say substantively about the application, but now that I've gotten that threshhold issue.

So unfortunately, in terms of Heslin and Lewis, we want no relief today except as set out.

THE COURT: All right. Do you know what --

You can sit down.

Do you know what page the motion ends on? Because it's 196 pages and I have to scroll through one by one unless I know the page number.

MR. BANKSTON: Are you referring to our application and motion?

MR. CHAPPLE: I can find it quickly.

THE COURT: Do you think it's 100 pages or --

MR. CHAPPLE: Your Honor, I have a hard copy.

THE COURT: Oh, okay, great. Thank you. That works even better. All right.

MR. BANKSTON: Oh, the last thing I should mention, Your Honor --

MR. BROOCKS: Is that of the exhibits, as well, or just the motion itself, the application?

EXHIBIT 1     18

Because I'm going to talk about that.

THE COURT:  These are the exhibits and the response.

MR. BROOCKS:  But the exhibits to the Plaintiff's turnover request, I want to make sure you have their proposed order in front of you because I'm about to discuss --

THE COURT:  Okay, calm down.

MR. BROOCKS:  -- everything he said. Apologize.

THE COURT:  I'm looking at an Application For the Postjudgment Turnover.  That's what I wanted. I don't know what else is in here yet, that's what I'm looking at right now.  Okay.  Because I wanted to see -- I couldn't recall off the top of my head if it had been filed as a motion that you joined or it was a joint motion.  It's a joint motion.

MR. CHAPPLE:  Your Honor, it was a joint motion that we filed.

THE COURT:  All right.

MR. CHAPPLE:  And there's not an order in that notebook.

THE COURT:  That's all right.

MR. CHAPPLE:  Because, based on the change in our plan moving forward, based on what the

EXHIBIT 1    19

Defendants filed, I have another order today that only relates to the Connecticut Plaintiffs and only relates to Free Speech.

THE COURT:  Did you happen to upload it to Box, as well, or not?

MR. CHAPPLE:  No.  I've got a hard copy right here.

THE COURT:  Okay.  That's fine.

MR. BANKSTON:  One last thing, just because I haven't put it on the record yet, hasn't been announced in open court, is that the Heslin Plaintiffs as well as the Pozner Plaintiffs, Mr. Fontaine's estate representative, are all in a settlement agreement and joint --

THE COURT:  I assumed that.

MR. BANKSTON:  So that's -- just so that that's on the record, we're all united on that.

THE COURT:  So, I used to do false claims act cases for relators and for the government, and those are -- I'm familiar with the concept and I assumed you wouldn't be here.

MR. BANKSTON:  Otherwise.

THE COURT:  Right.

MR. BANKSTON:  That's right.  Thank you, Your Honor.

EXHIBIT 1    20

THE COURT: So, that's fine.

All right. So, now I'll hear from -- I'm so sorry.

MR. BROOCKS: Broocks.

MR. CHAPPLE: Mr. Chapple.

THE COURT: Mr. Chapple, I'm sorry.

MR. CHAPPLE: Your Honor, may I approach?

THE COURT: Yes.

You want to use the podium.

MR. BROOCKS: I'm confused. Do I get a chance to respond to this fellow's accusations?

THE COURT: I haven't decided yet. It's an ex parte hearing.

MR. BROOCKS: Yeah, the argument he just made had nothing to do with -- he's talking about accusations of misconduct that are completely false. I can show you in ten seconds.

THE COURT: I haven't decided yet. It's an ex parte hearing.

MR. BROOCKS: Those accusations he just made are not. The accusations --

THE COURT: The entire hearing is an ex parte hearing. I haven't decided yet. I've asked to hear from Mr. Chapple. You understand that, right?

Are you going to look at your computer,

EXHIBIT 1    21

are you going to interrupt me and demand a response, and then ignore it when I give it to you?

MR. BROOCKS:  I apologize, I hear every word that you said.  I'm going to sit back down and be quiet until you call on me.

THE COURT:  Thank you.

Mr. Chapple.

MR. CHAPPLE:  Thank you, Your Honor.

As Mr. Bankston noted, none of the relief I'm seeking today relates to what I'll call the Texas Plaintiffs.  The only relief we're here seeking today relates to the Connecticut Plaintiffs and their application to appoint a receiver, Mr. Greg Milligan, as to Free Speech Systems.

Now, the Connecticut Plaintiffs have a final judgment against Judgment Debtor Free Speech Systems.  That final judgment is attached to the Declaration of Alinor Sterling, the trial attorney in Connecticut.

The final judgment is there, the final judgment has been exhausted in the appellate process in Connecticut.  It was affirmed in Connecticut.  A small dollar amount was reduced, but for all intents and purposes the lion's share of the judgment still stands. The Connecticut appellate court has denied a stay

EXHIBIT 1  22

pending the decision by the Supreme Court.  So, there's nothing staying collection efforts relating to the Connecticut judgment.

The Defendants have until September 5th to file a petition for certiorari with the United States Supreme Court, but that doesn't have any effect on whether or not collection efforts can move forward with regard to Connecticut.

Mr. Milligan, who is in the courtroom I believe at Your Honor's request, is here and ready to answer any questions that you may have.  Mr. Milligan is an Executive Vice President at Harney Partners.  He has over 25 years of experience.  He has experience as a Chief Restructuring Officer, as a Chapter 11 Trustee, as a Chapter 7 Trustee, as a court-appointed receiver in both state and federal court.  I believe he actually has been appointed a fiduciary in this court.

THE COURT:  He has.

MR. CHAPPLE:  In the R Partnership case.

THE COURT:  Yeah, we worked together for at least a year.

MR. CHAPPLE:  Your Honor, he's more than qualified to serve here.

So, from the court's perspective, two things have to be in evidence to allow for the

EXHIBIT 1    23

appointment of Mr. Milligan and the turnover order: Number one, a final judgment. We have that. The Connecticut judgment has been properly domesticated in Travis County.

THE COURT: That was going to be my question.

MR. CHAPPLE: And number two, the existence of non-exempt assets by the Judgment Debtor. We have that, as well. There are no non-exempt assets as to Free Speech Systems. So, at this point, Judge, the Court's task in this proceeding as to the entry of the order appointing Mr. Milligan as the receiver and the turnover order is only ministerial.

Now, there were a few issues raised in the -- in the response filed by the Defendants on Monday night. Your Honor, we have a reply to that response that I have here in hard copy that we haven't filed yet, but I can provide a hard copy to you and when I get to back to the office I can file it. It goes into detail refuting all of their arguments. But really, there are two principle arguments they make:

Number one is that the judgment hasn't properly been domesticated. That's not correct. The judgment was domesticated in Travis County upon filing of a foreign judgment under the Uniform Enforcement

EXHIBIT 1    24

Foreign Judgments Act, both the Plaintiff's Original Petition and the final judgment. It happens all the time. It's a final judgment.

Now, there are certain things that a Judgment Debtor can do to contest that finality: They have to file a motion for new trial, but they can't file any kind of motion for new trial. There are a few limited circumstances under which they can seek relief. They didn't do any of that here. That final judgment is final, those issues are not appealable. So, as we stand here today, the Connecticut Plaintiffs are entitled to pursue a receivership and a turnover order.

Now, one thing they did, Judge, the Defendants did remove the receivership action and they filed a bunch of counterclaims in federal court. The receivership action, the removal, our motion to remand and our motion to dismiss the counterclaims, are pending in front of Judge Lopez and haven't been ruled upon. They're going to be ruled upon by submission. But none of that affects the finality of the Connecticut judgment and the domestication. So, we have a final judgment sitting here.

One other principal issue that they argue in their reply is that the intervention was improper here. As you recall, Judge, this is the case where you

EXHIBIT 1 25

rendered the judgment. Judgment was rendered. Back in the fall, the Texas Plaintiffs sought a turnover order, which you signed, and then the Connecticut Plaintiffs intervened on the basis of that turnover order.

Very soon after that, the case was removed and its since come back here. It's been remanded. I have the notice of remand here, as well.

THE COURT: That's not exactly how I remember it, but the bottom line is the same.

MR. CHAPPLE: We get to the same place.

THE COURT: Right.

MR. CHAPPLE: So, in their papers the Defendants contend that the intervention was improper, but again, they misapply the law and the facts. To intervene in a postjudgment action like this merely requires that the Intervenors have an interest in the Judgment Debtor's property, and that's from a Court of Appeals case here in Austin, *Breazeale v. Casteel*. And again, all of this is in the papers that I'll provide to you. So, other courts that follow the Court of Austin appeals and allow third parties to intervene in receivership actions.

So, the intervention is proper, the Connecticut Plaintiffs have standing here, there is a final judgment that can result in the appointment of a

EXHIBIT 1    26

receiver and can result in the signing of a turnover order.

And Judge, like I alluded to earlier today, I have an order that is a little bit different than the one that we uploaded because it removes the Texas Plaintiffs and it also removes Alex Jones. Because, as Mr. Bankston discussed, you all are going to deal with that in due course. But today there's nothing preventing the Connecticut judgment and the Connecticut Plaintiffs from having a receiver appointed and having a turnover order.

I want to be clear, Mr. Milligan has been crystal clear, he is not going to do anything with relation to the Free Speech Systems' assets without the consent of the Chapter 7 Trustee. So, to the extent that Chris Murray, the Chapter 7 Trustee in the Alex Jones bankruptcy case, needs orders from the bankruptcy court to make sure that his transfer of assets to the receiver is okay, Mr. Milligan is going to, I don't mean to put words in his mouth, but he is going to work with the Chapter 7 Trustee to do that, and he is happy to discuss that here today.

THE COURT: So, I have intentionally not followed the bankruptcy case or really anything until it shows up here again. So, what is the status of the

EXHIBIT 1    27

bankruptcy case? Because I sort of felt like there was all -- there were some news articles, I mean I read the news as a citizen does, but. So, it sort of implied that the bankruptcy case was over.

MR. CHAPPLE: So, let me kind of give you the 30,000-foot view.

THE COURT: Okay.

MR. BANKSTON: Alex Jones Bankruptcy 101. So, there's Alex Jones' individual bankruptcy, right, and there's the Free Speech Systems bankruptcy. For a long while, both of those were Chapter 11 cases. And I may get my dates a little bit wrong. I believe at the end of 2023 there were motions to dismiss and/or convert both of those cases.

Judge Lopez ruled that the Alex Jones individual case should be converted to a Chapter 7. And that resulted in the appointment of Chris Murray, who we've been talking about, who is the Chapter 7 Trustee in the Jones case. He dismissed the Free Speech case. But when he dismissed the Free Speech case, he entered an order that said the Trustee in the Alex Jones case, Chris Murray, had some control over certain Free Speech assets. And really the intent of that was so the Chapter 7 Trustee could conduct the auction that you heard Mr. Bankston talk about.

EXHIBIT 1   28

THE COURT:  Okay.

MR. CHAPPLE:  So, that auction took place and --

THE COURT:  That was in the news.

MR. CHAPPLE:  Yes, the auction was in the news.  Certainly.  And so, the auction took place.  The Trustee went before Judge Lopez on a 9019 motion.  That's a motion in Bankruptcy Court to get a settlement authorized by the Court.  That's when Judge Lopez denied the 9019 motion, said he wasn't happy with the auction process.  He had a variety of questions.  He denied that relief.  And that's when you get into the issues that Mr. Bankston discussed regarding the vacating that order.

And so, as the bankruptcy case sits today, it's -- they're both relatively dormant.  They're -- and there are some adversary proceedings, as well, and so there are some hearings scheduled.  I believe we're set to be in front of Judge Lopez on a status conference maybe next month, I believe.  But, you know, relatively speaking, especially considering six months, a year, year and a half ago there's not a lot of activity in the bankruptcy case right now, and I think you saw the quotes from Judge Lopez that Mr. Bankston highlighted his clear desire to have the

EXHIBIT 1

29

Plaintiffs pursue their state court remedies, which is what we're trying to do today.

THE COURT: All right. Where is the domesticated order, where can I find it?

MR. CHAPPLE: It is -- I think I have it right here. I can get the cause number for you.

THE COURT: Okay.

MR. CHAPPLE: Okay. And may I approach with the --

THE COURT: So long as they have a copy.

MR. CHAPPLE: Yeah, okay, let me get my papers together and I'll approach.

THE COURT: Okay.

MR. CHAPPLE: Your Honor, here is the proposed order granting the relief as to only Free Speech Systems and the Connecticut Plaintiffs.

THE COURT: And then you're looking up the cause number you said.

MR. CHAPPLE: That's correct, Judge.

Your Honor, I can read it off to you, if you're ready.

THE COURT: Okay.

MR. CHAPPLE: It's D-1-GN-24-004752.

And Your Honor, I also have a hard copy of the reply that we're filing here today.

EXHIBIT 1    30

THE COURT: They have a copy of it?

MR. CHAPPLE: I'm about to provide it.

THE COURT: All right, thank you.

All right. So, this looks like you filed it back in, well, a year ago, August of 2024.

MR. CHAPPLE: That's correct, Your Honor.

THE COURT: And until -- it looks like a part -- a partial removal, nothing -- there was no response by the Defendants.

MR. CHAPPLE: Their response in state court was removal, Judge.

THE COURT: No, no, I mean until -- oh, I see what you're saying. So that happened some time ago, as well.

MR. CHAPPLE: That's right.

THE COURT: Okay. But just for -- it's a little confusing.

MR. CHAPPLE: And our position, and it's addressed in our reply, is that the law is clear that, upon that filing under the Uniform Enforcement of Federal Judgments Act, it acts as both an original petition and a final judgment. So, that's final.

THE COURT: Okay. Did you happen to get the receiver order I typically use when you drafted this, or is this entirely your own?

EXHIBIT 1   31

MR. CHAPPLE:  That's my own, Your Honor. My apologies.

THE COURT:  Okay.  I'm going to have to read the whole thing, then.

MR. CHAPPLE:  I understand.

THE COURT:  Okay.  So, a couple of things.  So, I've had a lot of receivership experience in the past seven years.  And you're right, I trust Mr. Milligan absolutely, but I have developed a standard order, some standard language in my receiver order that I do use in all of them.  So, I typically do require a bond, it's going to sound sort of silly in this case because the amount is not very much.

I also don't allow payment of a receiver fee without court approval, so I changed that language. I do allow the receiver to withhold the money up to 25 percent, but that actual payment has to come back to the court first.  So, I'll have to change those.

Can you send it to my staff in Word?

MR. CHAPPLE:  Yes, ma'am, absolutely.

THE COURT:  Okay.  Can you do it right now?

MR. CHAPPLE:  Yes, ma'am.

THE COURT:  So, to Keri Ward, keri.ward@traviscountytx.Gov, because she knows exactly

EXHIBIT 1    32

the language I like for those provisions.

Okay.  I've never been asked for an advance receiver fee before.  So, I'll ask you to talk to me a little bit about that --

MR. CHAPPLE:  Okay.

THE COURT:  -- before I make that decision.

I am fine with the expenses cap, that's not a problem.  I will say, to the extent you have to come back to exceed that amount, you don't need to have a full hearing on that.  So, the receiver, as everyone knows, works with the court to affect the judgment.  He doesn't work or she doesn't work for either party.

So, I allow some ex parte, because I don't consider it ex parte between the receiver and the court, communications; and that would include a request from the receiver directly to do something with expenses or to have some decisions made, things like that.  So, that would be allowed and would be fine and I don't know, yeah.  So, I don't know if that will be necessary or not, but that's something I would not object to.

Typically I do approve hiring additional professionals, because those fees can get big quickly. But again, it doesn't have to be a full blown hearing

EXHIBIT 1    33

necessarily, I just need the information in advance and then I can approve it in an order.

Now, Mr. Milligan, I know that you have staff. I'm assuming you are not considering the use of staff in your office as requiring an additional order, like is that --

MR. MILLIGAN: Correct.

THE COURT: That's subsumed under you. Okay.

MR. CHAPPLE: The order is on the way.

THE COURT: Oh, that's Miss DuBois, my court reporter. Miss Ward is in the back. She tries to avoid the courtroom.

The paragraph 15 has sort of a strange sentence. Are you essentially saying that if those individuals that you've labeled protected personnel, which I don't actually see -- I see receiver personnel -- oh, here we go. Where are they. They are the receiver, what's HMB, is that your company?

MR. MILLIGAN: Yes, Your Honor.

THE COURT: Receiver personnel, which is defined up here, Okay.

So, you're basically asking me to order that if you get sued by, I suppose, the Defendant or anyone else, that you could use the value in the

EXHIBIT 1    34

property for your defense costs?  Is that what you're asking?

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

I think you're just going to need to come back to court for that.  I mean, I'll add a sentence that that just needs to be approved by the Court before the money is used.

MR. CHAPPLE:  The --

THE COURT:  Indemnity.  So we need to wait for something to happen.

MR. CHAPPLE:  Understood.

THE COURT:  So we'll add that.

MR. CHAPPLE:  And you're going to add that language, Judge?

THE COURT:  We will.  Miss Ward, I'm sure, is already working on it.

So, what was the one I wanted you to talk to me about?  I've already lost my spot.

MR. CHAPPLE:  Your Honor, I believe it was 25,000 or 20,000.

THE COURT:  Oh, no, it was the advance fee, which you have as $10,000.

MR. CHAPPLE:  Got you.

THE COURT:  Judgment Creditor shall pay

EXHIBIT 1 35

the sum of $10,000 to the receiver as an advance on his fees.  And then would repay the advance to the judgment creditors from the first $10,000 of receivers fees earned.  So, that's a new one for me.

MR. CHAPPLE:  I think, Judge, just to the extent that the receiver incurs costs at the very initial outset of the receivership proceeding, whether it be --

THE COURT:  Well, so costs and fees are different.  If it said costs I'm not sure I would have raised the question.

MR. CHAPPLE:  I understand the distinction.

THE COURT:  So, do you mean costs or do you mean fees?

MR. CHAPPLE:  No, I mean costs.

THE COURT:  You mean costs.

MR. CHAPPLE:  Yes.

THE COURT:  Okay.  Then I think we can agree that its reasonable to get some money to pay for the costs of the efforts --

MR. CHAPPLE:  Yes.

THE COURT:  -- since it's likely to be pretty expensive.  So, let me -- so she's working on that part already.

EXHIBIT 1    36

Oh, I guess you did it this way because -- well, no, I usually get -- I have seen receivers submit separate costs and fees. I'm just trying to think about how the language with read.

MR. CHAPPLE: Which paragraph are you looking at, Your Honor?

THE COURT: It's 11.

I'm going to say "Expenses."

I also don't think it makes a lot of sense to repay it right away. So I'm saying that the Judgment Creditor, and its really just one in this order, correct?

MR. CHAPPLE: It is, correct, Your Honor.

THE COURT: May seek repayment at the conclusion of the receivership.

MR. CHAPPLE: That's fine.

THE COURT: Oh, the judgment, this actually should say -- I'm a little confused, I'm sorry, we're doing all this out loud.

MR. CHAPPLE: No, that's fine.

THE COURT: The judgment creditors are your clients.

MR. CHAPPLE: Yes.

THE COURT: So, this is wrong, it should say the judgment debtors.

EXHIBIT 1    37

MR. CHAPPLE:  What sentence are you looking at, Judge?  I'm sorry.

THE COURT:  The Judgment Creditors shall pay the sum of $10,000 for the receiver?  I mean you don't need an order for that, do you?

MR. CHAPPLE:  I think out of an abundance of caution here we put it in here.

THE COURT:  So, you are actually -- you're not planning to this 24 from the -- I misunderstood the whole paragraph.

MR. CHAPPLE:  I'm sorry, I should have been more clear.

THE COURT:  I just assumed you were trying to get them to.

MR. CHAPPLE:  No, it's an advance.

THE COURT:  FSS to pay.

Ignore everything I said.  Just delete all that.  We can't do that, I know.  Big old "Stet" here on that paragraph.

All right.  Well, I definitely have jurisdiction over this proceeding.  This is an ex parte proceeding, although we have the presence of all parties in the courtroom.  I do find that a judgment in the Connecticut cause, which I don't know the cause number so I'm just going to read from the proposed

EXHIBIT 1    38

order you gave me, CV-18-6046437 was rendered in Connecticut in all the appropriate courts and is valid, final, and payable.  I understand that there are some reductions through the Bankruptcy Court and through the appellate process in Connecticut, and so the number is slightly less than that.

I also find that the judgment is unsatisfied.

That Free Speech Systems, LLC, at least allegedly, owned property not exempt from attachment.  My guess is that all of its properties is probably not exempt from attachment, execution, or seizure for the satisfaction of the judgment; and that the judgment creditors are entitled to and need the aid of a receiver to enforce their judgment.

And so, I just want to make sure.

Okay.  The judgment is final and unpaid.

And I am going to grant the application.  I do think it should be granted, I am waiting for Miss Ward to change some of the language.

I appreciate your being here, Mr. Milligan.  As I mentioned before, I am familiar with your work, we did work together for approximately -- I think it was over a year at the end of it.  We tried to do it in a year, but lawyers,

EXHIBIT 1   39

right?

MR. CHAPPLE:  Tell me about it.

THE COURT:  It really wasn't the lawyers in that case.  On a really complicated case involving a lot of financial transactions and a lot of things, and I was very happy with the work that Mr. Milligan and his cohorts and colleagues performed for the court, so I am comfortable and happy to appoint Mr. Milligan in this role in this case.

And I think everything else in the order except those things I mentioned before, which are just the fee paragraph and the bond, which is I usually just do $500.  I know that seems kind of silly but I think it's a good idea just to -- for everyone, particularly people who may not be lawyers, who may pick this up and think, well, he gets to just take everything over and he didn't have to put anything up himself.  I think it's important for that, and that's why I do it.

So, we're going to all stay in the courtroom until Miss Ward gets this finished and brings it out here.  But that is the order of the court and I will sign that.

And so, that will conclude the ex parte part of this hearing.

Now, before you hop up, let's see,

EXHIBIT 1    40

Mr. Chapple, you can sit down.

So, Mr. Broocks, you wanted to respond to Mr. Bankston's allegations.  What I understood from him was that he's asking me to set a hearing to challenge a bond and for sanctions, two motions that have not yet been filed.  I am guessing everything he said today will be included in one or both of those motions and that you will have an opportunity to respond in writing and in argument when we have that hearing.

Obviously I never know what a lawyer is going to say before they stand up and start talking to me.  Mr. Bankston has been in front of me a lot, so he probably knows if he said, hey, I want to talk about some things that might not be perfectly on point for today, I might have said "no," so he didn't ask.  That's okay, that's a lawyer.  That's what lawyers do.  But that information, with the exception of letting me know that the Connecticut Plaintiffs or Lafferty Plaintiffs were here properly, really did not play into my decision today.  However, he did get to talk to me for about ten minutes on that; so if you want to do that now, I'll let you.

MR. BROOCKS:  Thank you, Your Honor.

THE COURT:  Would you like to do that?

MR. BROOCKS:  I would like to very much,

EXHIBIT 1    41

Your Honor.

THE COURT: Okay.

MR. BROOCKS: And I will be very brief about this.

What he's told you that is incorrect affects the validity of what you've just done, because it is true that in February, after a failed auction, Judge Lopez did say, this is over, it's void. But then we presented to him the fact that the Texas Plaintiffs had appealed to the federal district court the order. Because at one point in time Connecticut and Texas were very much at odds. And he said in a June hearing, he specifically said, my action in doing so was void. I didn't -- I did not void anything. And I've got the transcript here of the June 5th hearing.

So, he -- not only did he say, I didn't do it, he said, I didn't have the authority to do it, it was -- my act of doing so was itself void. And what this means for you, Your Honor, is that the -- and, in fact, even point out something else, the order that they asked you originally to sign and the one that you have just signed, let me get that, the page.

If you will look at the order you just signed, on page 3, they have you reflecting in your recitations you find that the Judgment Debtor FSS filed

EXHIBIT 1    42

for bankruptcy under Chapter 11, top of page 3, on July 29th, and I'm going to skip some of the parentheticals, in the Bankruptcy Court.

Then, Following a hearing on June 14th, the Bankruptcy Court issued two orders in the FSS Bankruptcy Case dismissing the FSS bankruptcy and vesting authority in the Trustee to take control of Judgment Debtor FSS, including its assets and bank accounts, and they cite the two orders. Then they say, Accordingly, the application only seeks relief relating to the following: As to the Judgment Debtor FSS, subject to the approval of the Trustee.

So, contrary to telling you that the orders are void, they have you signing this order saying the orders are still out there. Why did they include that, the recitation of two orders, if they thought they were void? Because they know they're not, Judge. He wasn't at the hearing. I was, Mr. Chapple was. Judge Lopez said, I didn't have the authority. And it even gets more complicated. Because under the federal Rules of Civil Procedure, once he had no authority to void an order, once its appealed, he can interpret it, but he can not change it, he can't void it. And he said so himself on June 5th, and I have the transcript.

EXHIBIT 1    43

Moreover, when they withdrew their appeal, they dismissed the appeal to the district court, what that did is it returned to -- the case to the Bankruptcy Court. He cannot, as he said in his transcript, he cannot, given the lapse of time, sua sponte undo the Supplemental Order. He said so. What he has to do is someone must make a Rule 60 motion for -- and because he said, I can't do it myself, that's clear federal Rules of Civil Procedure, that I have to wait for someone to do it, and no one has done so.

So, whatever you've been told I'm stunned to hear it, because I was at the hearing, we filed a motion pointing out his lack of jurisdiction to vacate it, he acknowledged that, he says it in writing, he says it multiple times, and I can show you, I have them bookmarked here. So, the point is not only is it incorrect to state that we have misrepresented things to you about the voiding of the order, it is just incorrect, he himself said that. And the consequence of your signing today a turnover order about assets that have been judicially decreed to go to the Trustee, as they acknowledge, is itself void. Is itself void.

The case of *Black vs. Shore*, which we argued and won in the Corpus Court of Appeals is about

EXHIBIT 1     44

that very subject:  Turnover orders issued when an automatic stay is in effect, and it is -- and -- is void.  Now, why would they ask you, to say, subject to the Bankruptcy Court Trustee?  The Bankruptcy Clerk Trustee has no authority to make decisions.

THE COURT:  I'm sorry.

*(Interruption in proceedings.)*

MR. BROOCKS:  May I continue, Your Honor?

THE COURT:  Yes.

MR. BROOCKS:  The Bankruptcy Trustee has no authority to make orders.  He always can make recommendations to the court.  It's the judge that does that.  Just like Your Honor.  You rule your court. Judge Lopez will take a Trustee's recommendations.  He can't do anything without Lopez's approval.  So, these caveats about subject to the Bankruptcy Trustee's approval is a meaningless statement.  He has no authority to make orders.  The order they asked you to sign is void and if you sign it and it stays in effect, a mandamus will be filed because it's just not right.

The facts that they told you about the domestication itself, we did remove the entirety of the process.  It's in federal court.  We have challenged under federal rules and law the validity of the domestication.  We have challenged it.

EXHIBIT 1    45

Your honor, it gets to complicated First Amendment issues that Your Honor didn't get presented, apparently, but we argued in the Austin Court of Appeals back at the end of May, but we have argued, you know, Rule -- I mean 183 violations that we say validated the domestication, and that's in front of Lopez.  The very order you asked for the case number is a federal action.  So, the domestication is not valid.

THE COURT:  Well, it might not be valid to Mr. Jones, but your removal doesn't mention Free Speech Systems at all.

MR. BROOCKS:  No, the current removal. The current removal.  But the one we achieved back when they filed --

THE COURT:  No, I'm looking at it, from last October.  It doesn't say Free Speech Systems.

MR. BROOCKS:  It was my understanding, Your Honor, I don't have the documents in front of me, but I've got -- my recollection was that the domestication and turnover sought was in its entirety removed.  If I'm mistaken, I apologize.

THE COURT:  Yeah, I think what we're going to do -- well, I don't think it, I know what we're going to do.  I'm going to leave it, because I actually, that's why I wanted to see this file, was how

EXHIBIT 1    46

was the domestication done.  And I looked at the removal and I only see that it's on behalf of Mr. Jones.  So, I agree if there had been an order presented to me for Mr. Jones that I would have a problem, but it wasn't, it's just Free Speech Systems.

So, I'm going to sign it.  I know Judge Lopez can scold everyone, including me, all the way from Houston, it's happened before, it can happen again.  But I am worried about these assets.  I'm quite concerned that more and more time going by is justice denied, and that is not what we want in our courts and in our country, much less our state.

So, I am going to stick with my decision.  I have heard you, we will come back on all the other things; but I feel like I have looked at the issues and the actual record in the court's file, and I don't think Free Speech Systems is part of that removal.  If I'm wrong, of course someone will tell me; and I'll change whatever I have to change, so.

MR. BROOCKS:  All right.  Thank you for hearing me out on that.

THE COURT:  Of course.  Always.  Just at the right time.

MR. DAUGHTRY:  Judge, can I make one correction?  Just what Mr. Broocks said, the transcript

EXHIBIT 1   47

of the hearing was not June, it was February 5, 2025, in which the Court said, I lose jurisdiction over that order immediately.

THE COURT:  Well, that's okay.  I'm not --

MR. DAUGHTRY:  I just didn't want a problem --

THE COURT:  I appreciate that, trying to be accurate.  I do.

All right, well, while we wait for the order, I guess we can look at the calendar.  You're right, I normally require a motion to be filed before a hearing is set, but since you know what you're going to file, the case is only coming to me, we really do that to control the dockets more than anything else, we can look ahead now.

History as a guide, everyone will want to file paperwork for me to read in advance, and probably a lot of it; so we need to build in some time.  So, let's start by thinking when you think you'll get your motions filed, Mr. Bankston.

MR. BANKSTON:  Okay.

THE COURT:  And then how much time you think you need, Mr. Broocks.

MR. BROOCKS:  May I make a comment?

EXHIBIT 1     48

THE COURT: You may.

MR. BROOCKS: As I understand the rules of the protest of the bond, we are entitled to get some discovery here. So, if -- I haven't seen their papers, all I can go on is what has been said he's going to say. To the extent that some of these issues he's addressed here today are going to be raised, I intend to take people's depositions. It won't be long, but these are serious allegations and serious questions if we're entitled. So, I wanted the Court to factor that into your scheduling is all same saying.

THE COURT: Well, here is what I'll -- we'll pick a date based on briefing schedules alone. And then if some issues arise and you think you need to conduct discovery, and they either agree and then you can say, Judge, we would like to push our hearing date by one week, or whatever it is, or they don't agree and they file a motion to quash, we'll have a hearing on that if you set it. If you don't, we'll just proceed with the hearing. So, we'll just handle it in the normal way instead of trying to anticipate how much fighting there will be.

MR. BROOCKS: Thank you, Your Honor.

THE COURT: Because then we would have to set it in like two years, and that doesn't do anybody

EXHIBIT 1    49

any good.

MR. BROOCKS:  Thank you, Your Honor.

MR. BANKSTON:  Just for safety sake why don't we say I can get it on file by Monday.

THE COURT:  Okay.  So, that's less than a week.

MR. BANKSTON:  Yes.  They're almost ready.  So, I anticipate Friday but let's just be safe and say Monday.

THE COURT:  So, if you receive his motions on Monday, August 18th, how much time do you think you need to respond?  We're just talking about briefing right now, not on everything that could possibly happen.

MR. BROOCKS:  Judge, I know you're not interested in my calendar, you know, and I understand that.

THE COURT:  And I know you have a lot of people that work with you.  I'm just asking you how much time do you want to get a response brief on file.

MR. BROOCKS:  And it's difficult to respond to that without having seen the motion, but I would say I've got a brief in California due on the 22nd and the Supreme Court September 5th.

THE COURT:  Are you saying they're more

EXHIBIT 1   50

important than me?

No, it's a joke.

MR. BROOCKS:  If they file it on Monday, the 18th -- may I confer, Your Honor?

THE COURT:  You may.

*(Pause in proceedings.)*

MR. BROOCKS:  Your Honor, can we have three weeks?

THE COURT:  Three weeks is a lot.

Also this is a mistake.

MR. BROOCKS:  That will be September 1st anyway, Labor Day.

I'm sorry, did you say "no" to three weeks?

THE COURT:  I did and then I got distracted by this order.  Because --

All right, Miss Ward, you've got to come back.  I'm sorry, it's not quite right.

*(Pause in proceedings.)*

THE COURT:  Okay, how about two weeks.

MR. BROOCKS:  That would put us at Labor Day?

THE COURT:  September 2nd.

MR. BROOCKS:  Monday?

THE COURT:  Oh, September 1st.  It's

EXHIBIT 1   51

Labor Day.

MR. BROOCKS:  Instead of ruining my son's Labor Day, what if we book the 29th, the Friday before.

THE COURT:  Sure, you got it.

MR. BROOCKS:  Okay, I'm being overruled. He is going to ruin my Labor Day.  So, I'll do the 2nd, if Your Honor will give it to me.

THE COURT:  Okay.  So, I need to keep track of this.  So, we are going to do August 18th, September 2nd.

I've never known Mr. Bankston to turn down an opportunity for more words.  Would you like the opportunity to file a reply?

MR. BANKSTON:  I think that's -- I would probably take advantage of that, I would imagine.

THE COURT:  Is a week enough time?

MR. BANKSTON:  Oh, yes, absolutely.  In fact, I was going to suggest having the hearing a week after the due date.

THE COURT:  But I have to read it all.

MR. BANKSTON:  So, you have to read the reply.

THE COURT:  So, 9/9, Mr. Bankston.

MR. BANKSTON:  Okay.  That can work.

THE COURT:  And then that means we're

EXHIBIT 1    52

going to -- oh, Miss Ward is on vacation the week later.

How much time do -- you think we can get this done in half a day, right?

MR. BANKSTON:  Oh, yeah, definitely not a full day, Your Honor.

THE COURT:  Okay.  Well, that doesn't leave me with any choices.  So, all right, morning or afternoon?

MR. BROOCKS:  Afternoon preference.

THE COURT:  Afternoon?  Afternoon okay?

MR. BANKSTON:  That's fine with me, Your Honor.

THE COURT:  Tuesday, September the 16th at 2:00 p.m.

MR. BANKSTON:  Thank you, Your Honor.

THE COURT:  Now, you'll still need to announce.  I'll get it set but you'll still need to announce.

Now, we just have to wait for Miss Ward. Because I lied to her and told her to only change two things and then I was like, oh, no, actually change these other things, too.  So, we're all just going to wait.

MR. BROOCKS:  While we're waiting can I

EXHIBIT 1    53

run down the hall?

THE COURT: To do what?

MR. BROOCKS: Go to the bathroom.

THE COURT: Just don't make any phone calls to anyone. Don't tell anyone to do anything, because I haven't signed the order.

MR. BROOCKS: I'll sit back down.

THE COURT: And I don't mean to be casting aspersions on your ethics, but just I have seen a lot of shenanigans in this case.

MR. BROOCKS: And I want to say on this subject, we have nothing but the highest respect for this Court, and I want you to understand this, this is nothing but the highest respect for this Court at all times.

THE COURT: Thank you.

And I take that as the court, an institution, not me.

MR. BROOCKS: No, you, too. Well, the court, obviously, but you, as well.

THE COURT: Well, I'm not worried about me. I'm worried about our institutions, I'm worried about the rule of law, I'm worried about professional ethics. Those are the things I worry about.

MR. DAUGHTRY: Your Honor, would it be

EXHIBIT 1   54

fair to request that we have a copy of the PowerPoint that was put on the screen today, since that really is planted in your mind and there's a lot that needs to be --

THE COURT:  Well, I'll tell you what, I don't have a copy of it.

MR. DAUGHTRY:  I meant could you ask --

THE COURT:  Let me finish.  I don't have a copy of it, and he's going to put it all in his brief, his motions, and you'll definitely get that. And so, I think we'll just both wait until we have what counts as a real legal filing in the case.  Okay?

MR. DAUGHTRY:  Okay, Judge.

THE COURT:  Thank you, Miss Ward.

All right, let me just look through it real quick.

*(Pause in proceedings.)*

I don't want to send her back to do another edit, I just for the first time noticed in the broad definition of "Rights" it says, "Hire any person necessary," but I have changed the language in the more particular clause to say "with court approval," and I intend that to govern over the clause in general rights.  You understand, Mr. Milligan?

MR. MILLIGAN:  I do, Your Honor.

EXHIBIT 1     55

THE COURT: Okay. Thank you.

All right, August 13th, the order is signed.

If you want a copy I'll have my Judicial Executive Assistant -- okay, so, we'll get file stamped copies made and brought back out for you.

Yes, Mr. -- oh, you're just ready to leave. No problem.

I am going to give you this back.

MR. CHAPPLE: Oh, thank you, Judge.

THE COURT: Thank you.

And we have our schedule. And I'll get the hearing set, but you've got to announce. Don't forget to do that. It will be in person, we'll be here.

Anything else before we go? No?

MR. BROOCKS: Nothing, Your Honor.

THE COURT: All right. Thank you all very much.

We will take, for my other case, about a 15-minute break. Thank you.

MR. BANKSTON: Thank you, Your Honor.

MR. BROOCKS: Thank you, Your Honor.

*(Evening recess.)*

**EXHIBIT 1** 56

REPORTER'S CERTIFICATE

THE STATE OF TEXAS        )

COUNTY OF TRAVIS          )

I, Alicia DuBois, Official Court Reporter in and for the 459th District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the Proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this, the 15th day of August, 2025.

*/s/ Alicia DuBois*
Alicia DuBois, CSR
Texas CSR 5332
Exp. Date: 1/31/26
Official Court Reporter
459th District Court
Travis County, Texas
1700 Guadalupe
Austin, Texas 78701
(512) 854-9301

EXHIBIT 2

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00209-CV

---

**Alex E. Jones and Free Speech Systems, LLC, Appellants**

**v.**

**Neil Heslin and Scarlett Lewis, Appellees**

---

### NO. 03-25-00617-CV
### NO. 03-25-00906-CV

---

**Free Speech Systems, LLC, Appellant**

**v.**

**Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash, Appellees**

---

**FROM THE 261ST & 459TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-001835, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N   A N D   O R D E R

**Per Curiam**

EXHIBIT 2

This memorandum opinion and order addresses three appeals arising from the same trial-court cause.

This Court abates the appeal in Cause No. 03-23-00209-CV and remands that cause to the trial court to take evidence and make findings regarding the supersedeas bond contest. *See* Tex. R. App. P. 24.4(d). The evidence and findings shall include events occurring since the trial court's October 6, 2025 Order on Plaintiffs' Objection to Net Worth Declaration and Motion for Sanctions. The trial court shall direct that its order be filed with this Court in a supplemental clerk's record by May 29, 2026.

This Court's August 28, 2025 Order staying the turnover order in Cause No. 03-25-00617-CV remains in effect. This Court temporarily stays the turnover order in Cause No. 03-25-00906-CV pending further order on the Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay. *See* Tex. R. App. P. 24.3 ("The appellate court may issue any temporary orders necessary to preserve the parties' rights.").

It is ORDERED April 29, 2026.


Before Chief Justice Byrne, Justices Kelly and Ellis

No. 03-23-00209-CV – Abated and Remanded

No. 03-25-00617-CV – Ordered

No. 03-25-00906-CV – Ordered

Filed:   April 29, 2026

2